657 P.2d 109

**DEATON, INC., Plaintiff-Appellee,**

v.

**AEROGLIDE CORPORATION, Defendant-Appellant.**

**No. 13806.**

Supreme Court of New Mexico.

Dec. 6, 1982.

Rehearing Denied Jan. 7, 1983.

Civerolo, Hansen & Wolf, Kathleen Davison Lebeck, Dennis E. Jontz, Albuquerque, for defendant-appellant.

Alfred M. Carvajal, Albuquerque, for plaintiff-appellee.

## OPINION

PAYNE, Chief Justice.

This case presents several questions under the Uniform Commercial Code, Sections 55–1–101 to 55–9–507, N.M.S.A.1978 (Cum. Supp.1982), which have not been considered before in New Mexico. Because of the importance of the facts in this case, we set them forth in detail.

The defendant, Aeroglide Corporation, manufactures a piece of industrial machinery called a Mini Dump, which is installed on the bed of a pickup truck so the truck can be used as a small dumptruck. Aeroglide solicited Deaton, Inc., as a New Mexico distributor for its Mini Dumps and Deaton agreed to become a distributor. In February 1978, Deaton ordered 24 Mini

Dumps as required by the distributorship agreement. Deaton testified that when the units arrived, some appeared to be new and others appeared used. Several units also appeared damaged. Deaton complained to Aeroglide, and was informed that the units had been inspected before shipment and "they were in good shape." Aeroglide admitted that two of the units had been mounted for demonstration, but stated that they had not been used otherwise. Shortly thereafter, Aeroglide sent paint and replacement parts to repair the defective units.

In May 1978, Deaton wrote to Aeroglide and stated that the Mini Dumps failed to operate properly. Deaton also stated that it was "no longer interested in selling Mini Dumps," and requested that Aeroglide pick them up and fully refund its cash outlay of $23,499.02, which included miscellaneous costs for storage and materials. By return letter, Aeroglide stated that "some problem developed in storage," and promised it would try to locate another distributor in the area. No distributor was ever found. In May 1978, Aeroglide sent a telegram cancelling the agreement.

In July 1978, Deaton wrote to Aeroglide and demanded payment of $23,599.02, an additional $100 having been incurred for storage costs. Later, Deaton agreed to continue to store the units and told Aeroglide that the carrier had admitted liability for damage to the Mini Dumps. Aeroglide then informed Deaton that the defective units could be easily repaired and accused Deaton of making no attempt to remedy the defects. Aeroglide then offered to pay Deaton $21,976.39 plus storage costs, provided that title would revert to Aeroglide and Deaton would assist Aeroglide in the prosecution of its claim against the carrier. However, Aeroglide also indicated that it was "not willing to absorb" the shipping costs at that time, but that it would continue to look for a distributor in New Mexico. Deaton refused this offer. In August 1978, Deaton sued Aeroglide for breach of contract on the ground that the units were defective and unfit for their intended use.

In September 1978, Aeroglide offered to "repurchase" the Mini Dumps for $21,976.39, and stated that Deaton's acceptance of this offer would "not affect any claim [it] assert[ed] except claim for refund of this amount." Rejecting this offer, Deaton stated that it would "not settle for anything less than the cost of the units, shipping, storage, and an amount of $10,000 for his inconvenience and trouble in pursuing [sic] this action against Aeroglide." Two years later, on June 30, 1980, Deaton sold the units to a third party in a private sale for $9,200. No notice of this sale was given to Aeroglide.

The trial court entered its judgment in June 1981. It found that the units were defective and nonconforming as delivered, and that the value to Deaton was substantially impaired. The court also found that Deaton had a right to reject the Mini Dumps and to revoke any acceptance it may have made. Deaton was awarded $30,352.76 as follows: unrecovered purchase price and shipping costs $15,047.22, lost profits of $8,837.78, and incidental damages of $7,467.76. Aeroglide appeals.

*Warranty.*

The trial court found that the contract contained disclaimers of warranty which did not mention merchantability and fitness, were not conspicuous, and were ineffective disclaimers of express warranties. Aeroglide contends that this finding is erroneous and not supported by the evidence.

The original sales contract that Deaton signed contained the statement at the top of the description section of the form which reads:

SUBJECT TO ALL THE CONDITIONS PRINTED ON THE BACK OF THIS SHEET, AEROGLIDE CORPORATION SHALL SELL AND THE UNDERSIGNED SHALL BUY THE FOLLOWING:

The reverse side lists 10 paragraphs of conditions, all in the same type and size. The first paragraph states the "Seller guaranties all equipment it manufactures to be free from defective material or workmanship." The second paragraph states:

There shall be no implied warranty of merchantability or of fitness for a particular purpose or use. No other warranties shall be recognized unless expressed in writing and signed by an officer of the seller.

Deaton claims that express warranties were created by Aeroglide's literature, the verbal representations of its agents, the demonstrator model, and by the contract itself.

In our view, the contractual clause sufficiently disclaims any implied warranties. Section 55–2–316(2), N.M.S.A.1978, permits exclusion of implied warranties of merchantability if the contractual language mentions merchantability and is conspicuous. Comment 4 to the section indicates that implied warranties of fitness for a particular purpose may be excluded by general language if the writing is conspicuous. The question of conspicuousness is a question of law for the court to decide, Section 55–1–201(10), N.M.S.A.1978. Thus, we may examine the contract to see if the trial court's finding was correct.

 Initially, it is obvious that the trial court erred in finding that the disclaimer did not mention merchantability and fitness. The question remains, however, as to whether the disclaimer was conspicuous. Section 55–1–201(10) provides that a term is conspicuous if it is so written that a reasonable person ought to have noticed it, and if it has a printed heading in capitals. Here, the reference to the disclaimer was printed in capitals. Language which refers the reader to conditions or provisions on the reverse side of the form suffices to make the language referred to conspicuous. *See Hunt v. Perkins Machinery Co.,* 352 Mass. 535, 226 N.E.2d 228 (1967). We hold that the disclaimer in this contract was conspicuous and should have been noticed by a reasonable buyer. Accordingly, all implied warranties were properly disclaimed by Aeroglide.

 The more difficult question is whether the express warranties were properly disclaimed by the clause. Section 55–2–313, N.M.S.A.1978, provides that express warranties may be created by any affirmation of fact relating to the goods which is part of the basis of the bargain, and by any sample or model which is made part of the basis of the bargain. The seller need not use formal words to create an express warranty. Under Section 55–2–313, the representations made by Aeroglide's literature, the demonstrator model, and the contract itself amount to express warranties. Therefore, these words and conduct are relevant to the creation of an express warranty under Section 55–2–316, N.M.S.A.1978, and must be construed in light of the disclaimer. Note 1 to section 55–2–316 states that the statute is intended "to protect a buyer from unexpected and unbargained language of disclaimer" by denying effect to disclaimers which are inconsistent with language of express warranty. Like the trial court, we hold that the disclaimer cannot be construed to be consistent with the express warranties created by Aeroglide's representations. We also hold that the disclaimers are inoperative to void those express warranties.

### Breach of Warranty.

The trial court found that the units were defective and nonconforming when delivered, and that their value to Deaton was thereby substantially impaired. Aeroglide contends that this finding is erroneous and not supported by the record. We cannot agree.

 In order to recover for breach of warranty, a buyer must prove four essential elements: (1) the existence of a defect; (2) that the defect was caused by the seller; (3) that the buyer notified the seller and sought repairs; and (4) that the seller failed or refused to repair or replace defective parts. *Arnold v. Ford Motor Co.,* 90 N.M. 549, 566 P.2d 98 (1977). Aeroglide's representations included a demonstrator which was clean and attractive. There was evidence that when the units arrived, they were rusted and bent, that switches and mounting brackets were missing, and that electric cables had been cut. In our view, this evidence supports a finding that the

Mini Dumps were defective when delivered. Aeroglide notes that the carrier admitted liability for part of the damage and contends that Deaton did not prove it caused the defects. However, the evidence indicates that the paint and some of the welds on the Mini Dumps were defective. There is no evidence that these defects could have been caused by the carrier.

The evidence shows that after Deaton notified Aeroglide of the defects, Aeroglide sent parts and supplies which it thought were necessary to repair the units. However, Aeroglide claims it was never notified that the attempted repairs failed, and that the tendered parts and supplies were insufficient; nor, Aeroglide claims, did Deaton request further cure of defects. Whether or not Deaton requested further cure, it is apparent that Aeroglide knew Deaton was unsatisfied. Aeroglide's telegram to Deaton in May 1978, indicated that the agreement was formally cancelled. Aeroglide cannot claim at this late stage that it did not have adequate notice of Deaton's dissatisfaction. Therefore, the trial court's finding that there was a breach of warranty was not erroneous.

*Rejection.*

Section 55–2–601, N.M.S.A.1978, allows a buyer to reject the entire tender of goods if the goods fail in any respect to conform to the contract. The trial court found, and we agree, that the goods did not conform to the contract. The trial court found that Deaton had a right to reject the Mini Dumps and revoke any acceptance it may have made. Finally, the trial court found that Deaton's May 1978 telegram informed Aeroglide it was rejecting or revoking acceptance of the Mini Dumps. We hold that these findings are supported by substantial evidence.

■ Aeroglide complains that Deaton did not introduce evidence that the value of the Mini Dumps to Deaton was substantially impaired. This is a relevant factor where the buyer claims revocation under Section 55–2–608, N.M.S.A.1978. However, it is apparent from this complaint that Deaton was simply rejecting the goods. Nowhere does

Aeroglide show that goods "fail in any respect" to conform to the contract. Deaton was not required to prove substantial impairment.

*Alleged Acceptance.*

■ Aeroglide contends that after Deaton gave notice of the defects, Deaton's actions were tantamount to an acceptance under Section 55–2–606(1)(c), N.M.S.A.1978. That section states:

(1) Acceptance of goods occurs when the buyer:

. . . .

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

Aeroglide asserts that certain actions by Deaton constituted acts inconsistent with its ownership. Deaton rejected Aeroglide's offer to refund Deaton's cash outlay for the units because the shipping costs were not included in the refund. Furthermore, Deaton held the Mini Dumps for a period of two years after the rejection. During that time, Deaton asserted dominion over the goods, stored them in a place where they were exposed to the elements, failed or refused to turn them over to Aeroglide, and resold them to a third party in a private sale without notice to Aeroglide.

Section 55–2–602(2), N.M.S.A.1978, reads as follows:

(a) after rejection any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller; and

(b) if the buyer has before rejection taken physical possession of goods in which he does not have a security interest under [Section 55–2–711, N.M.S.A.1978], he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but

(c) the buyer has no further obligations with regard to goods rightfully rejected.

Section 55–2–711(3), N.M.S.A.1978, reads:

(3) On rightful rejection . . . a buyer has a security interest in goods in his

possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller. Since Deaton rightfully rejected the Mini Dumps, it necessarily follows that it had a security interest in the units pursuant to Section 55–2–711(3). Deaton had a security interest in the entire amount spent for the units and should not be required to return them for an amount less than this entire amount. Consequently, subsection (b) of Section 55–2–602(2), N.M.S.A.1978, cannot apply. Because the security interest entitles Deaton to hold the goods and resell them, such action cannot constitute a violation of subsection (a) of Section 55–2–602(2). The remaining provision of Section 55–2–602(2) simply provides that Deaton had no further obligation with regard to the Mini Dumps. Therefore, Aeroglide's argument that Deaton's actions constituted acceptance must fail.

*Damages.*

Under Section 55–2–711, N.M.S.A.1978, Deaton was entitled to recover the purchase price and damages for nondelivery as well as for expenses incurred in handling the goods in which it had a security interest under subsection (3). As indicated previously, the trial court awarded damages for lost profits, incidental damages, and the unrecovered purchase price and shipping costs.

*a. Lost Profits.*

■ The trial court awarded lost profits based on the difference between the cost of the units to Deaton and Aeroglide's suggested retail price. There is no established rule in New Mexico as to whether lost profits may be recovered in situations such as this. *See generally* 3 A. Squillante and J. Fonseca, Williston on Sales, § 25–12 (Cum.Supp., 4th Ed.1982). The trend elsewhere is to allow lost profits even when the business is new if the loss can be proved with reasonable certainty. *Clark v. International Harvester Co.,* 99 Idaho 326, 581 P.2d 784 (1978). Lost profits need not be

proved with mathematical certainty. *See Nosker v. Western Farm Bureau Mutual Insurance Co.,* 81 N.M. 300, 466 P.2d 866 (1970). However, the only basis for awarding lost profits in the instant case was the difference between the suggested retail price and the cost to Deaton. The business was entirely new. Deaton produced neither proof of potential buyers nor evidence of its cost of doing business. Therefore, we hold that the award of lost profits is too speculative to be upheld.

*b. Incidental Costs.*

■ The trial court awarded incidental damages as follows:

| | |
|---|---:|
| Unloading costs | 82.50 |
| Conoco Oil | 7.60 |
| Yellow Freight (parts shipment) | 24.35 |
| Sand for testing loads | 12.35 |
| Storage charges for 28 months | 2,800.00 |
| Employee's expenses (Garreffa) | 565.15 |
| Long Distance Calls | 20.81 |
| Occupational Tax Fee | 5.00 |
| Purchase of demonstrator truck | 3,950.00 |
| | $ 7,467.76 |

Except for the cost of the demonstrator truck, the award of these expenses under Section 55–2–711(3) is supported by the record. These expenses were reasonably incurred in the inspection, receipt, transportation, care and custody of the Mini Dumps. However, we hold that the trial court improperly awarded the cost of the demonstrator truck as an expense. Because Deaton introduced no evidence at trial as to the actual expense of using the truck in handling the Mini Dumps, no amount may be awarded. Therefore, we hold that the award of damages for incidental expenses must be reduced by $3,950.00.

*c. Unrecovered purchase price.*

■ Because Deaton had a security interest under Section 55–2–711(3), he had a right to resell the goods as provided by Section 55–2–706, N.M.S.A.1978. In order to recover the balance of the purchase price paid to Aeroglide, the resale must have been made in good faith and in a commercially reasonable manner. § 55–2–706(1). Where the resale is a private sale, Deaton

must have given Aeroglide reasonable notification of its intention to resell. § 55–2–706(3).

Although Deaton had the right to resell the property, and such a resale would not have constituted an acceptance, the only way Deaton could have recovered the difference between the resale price and the contract price was to have complied with Section 55–2–706. Deaton failed to do so. Not only did Deaton fail to give proper notice, *See Foster v. Colorado Radio Corp.*, 381 F.2d 222 (10th Cir.1967); *Anheuser v. Oswald Refractories Co., Inc.*, 541 S.W.2d 706 (Mo.App.1967) the sale was commercially unreasonable as well. Deaton waited nearly two years before reselling the units. During this time, the condition of the units further deteriorated. Excessive delay in such a resale is enough to make the sale commercially unreasonable. *McMillan v. Meuser Material & Equipment Co., Inc.*, 260 Ark. 422, 541 S.W.2d 911 (1976). It rejected a refund offer of $21,976.39, then accepted an offer of $9,200. There is no indication that Deaton sought other buyers or made any attempt to sell the units until it received an offer from a buyer some two years after it took delivery. Under these circumstances, we cannot hold that Deaton complied with Section 55–2–706. Accordingly, this element of damages cannot stand.

Under Section 55–2–711(1)(b), N.M.S.A. 1978, Deaton could have recovered the difference between the market price when he learned of the breach and the contract price. However, because Deaton did not introduce any evidence of the market price at trial, we cannot entertain this argument on appeal.

*Conclusion.*

The judgment of the trial court is affirmed as modified, and the case is remanded with instructions to reduce the award to the amount of $3,517.76.

IT IS SO ORDERED.

STOWERS, J., and REUBEN E. NIEVES, District Judge, concur.