T & S BRASS AND BRONZE WORKS, INC., Appellee,

v.

PIC–AIR, INC., Appellant.

No. 85–1030.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 5, 1985.

Decided May 12, 1986.

Vivian L. Crandall (E. Riley Anderson, Joyce, Anderson & Meredith, Oak Ridge, Tenn., on brief), for appellant.

Joseph M. Jenkins, Jr. (Horton, Drawdy, Ward & Johnson, P.A., Greenville, S.C., on brief), for appellee.

Before WIDENER and CHAPMAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

In this diversity action for conversion and counterclaim for breach of contract, Pic-Air, Inc., appeals a judgment holding it liable to T & S Brass and Bronze Works, Inc., for $22,000, and holding T & S liable to Pic-Air for $14,931. We affirm the magistrate's judgment with but slight modification.[1]

I

In February 1981, T & S Brass, a supplier of plumbing fixtures, paid Pic-Air $22,000 for the design and manufacture of

---

1. The magistrate obtained jurisdiction pursuant to 28 U.S.C. § 636(c).

tooling to be used to cast zinc faucet handles for T & S. The tooling, which T & S owned, remained in the possession of Pic-Air, enabling it to produce handles for T & S under subsequent purchase orders.

In February 1983, T & S and Pic-Air contracted for the purchase of 52,500 faucet handles to be cast from the tooling. The handles were to be delivered by Pic-Air in four installments, beginning May 6, 1983. The contract specified that time was of the essence and that Pic-Air could not subcontract without first notifying T & S. The contract also provided that Pic-Air would deliver the tooling to T & S on demand.

On March 28 Pic-Air informed T & S by telephone that until T & S paid an outstanding invoice and agreed to pay an increased price for the handles, Pic-Air would not begin production. T & S agreed orally to both requests, and on March 30 Pic-Air ordered production to begin. T & S paid the invoice the following day.

On April 7, Pic-Air assured T & S that the May 6 installment would be delivered on time. Soon thereafter T & S learned that Pic-Air had subcontracted to a manufacturer in Taiwan, and in a letter dated April 14, T & S informed Pic-Air that the subcontracting violated the contract. Four days later T & S confirmed its oral agreement to pay the increased purchase price.

On April 21, Pic-Air notified T & S that the May 6 installment would not be delivered on time unless T & S agreed to pay the cost of air freight. Because delay would substantially disrupt its business, T & S agreed to pay for air freight and demanded assurance that subsequent installments would be on time. On April 26, Pic-Air gave the requested assurance, but on May 5 it notified T & S that the second installment of handles would not arrive on time unless T & S again agreed to pay for air freight. T & S agreed. Both the first and second installments arrived on time and were accepted.

On June 22, T & S received a third installment of more than 20,000 handles. The following day T & S phoned Pic-Air, informing it that at least 40 percent of the handles were unacceptably scratched and requesting return of the tooling. On June 27, representatives from Pic-Air came to T & S to examine the handles and discuss the problem. At this meeting T & S offered to sort the handles and return those that it could not use, charging Pic-Air for the costs of sorting. Alternatively, T & S offered to allow Pic-Air employees to sort the handles at the T & S facility. T & S told Pic-Air that it intended to change vendors, and it again demanded return of the tooling.

On June 29, Pic-Air notified T & S that the "slight imperfections" in the handles did not justify rejection and that Pic-Air did not authorize T & S to sort the handles. Pic-Air reiterated this position in a telex of July 5. Pic-Air did not respond to the demand for the tooling's return. T & S sorted the handles and used about half of them. In the later part of July, Pic-Air, without acknowledging that any of the parts were defective and without offering to pay sorting costs, asked T & S to return those handles that T & S claimed were defective. Pic-Air told T & S that its Taiwan subcontractor would replace the handles if in fact they were defective. T & S declined to return the handles on these terms.

On August 4, Pic-Air advised T & S that, because T & S had not paid for the prior three installments or for the air freight, Pic-Air would ship the outstanding fourth installment C.O.D., upon T & S's authorization.

By letter of August 8, Pic-Air for the first time acknowledged that improper packaging had caused scratches on some of the handles and again asked T & S to return the handles that it deemed defective. Pic-Air proposed that it would then determine whether or not these handles were defective and would replace the defective ones. Pic-Air expressly refused to pay the costs of sorting the handles. T & S did not return the defective handles.

On September 15, T & S filed this action against Pic-Air for conversion of the tooling. T & S sought damages of $22,000, the quoted purchase price for the tooling. Pic-Air counterclaimed for the air freight charges, the contract price of the three delivered installments, and the contract price on the fourth installment, which was never shipped.

The magistrate found that Pic-Air had converted the tooling as of April 14, 1983, the date of T & S's letter informing Pic-Air that it had breached the clause prohibiting subcontracting without prior notice. The magistrate entered judgment against Pic-Air for $22,000, plus prejudgment interest dating from April 14. The magistrate ruled that T & S was not liable for the air freight charges or for the price of the installment not shipped. The magistrate ruled that T & S's liability of $21,998 for the three delivered installments should be reduced by $6,792 for the defective handles and by $275 for the cost of sorting, resulting in a judgment against T & S of $14,931. The magistrate authorized T & S to sell the defective handles for scrap and apply the proceeds to Pic-Air's account if Pic-Air elected not to take possession of the handles in 60 days. Pic-Air appeals.

## II

■ Courts sitting in diversity cases are required to apply the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). The contract for the handles specified that the law of South Carolina governed. Because South Carolina enforces choice-of-law clauses, the magistrate properly applied South Carolina law. *See* U.C.C. 1–105(1), S.C.Code Ann. § 36–1–105(1) (1976).[2]

## III

Pic-Air asserts that the magistrate erred in ruling that T & S was entitled to a setoff for the price of the defective handles and for the cost of sorting these handles from acceptable ones.

■ The magistrate found that 10,955 handles were defective. This finding, supported by testimony from the supervisor of quality control at T & S, is not clearly erroneous. The court properly concluded that T & S had rightfully rejected the defective handles. *See* U.C.C. 2–601(c) (1978) (buyer's right on receiving nonconforming tender to accept some of the goods and reject the rest).

■ Pic-Air contends, however, that even if the handles were defective, T & S's failure to return them deprives it of a setoff. Pic-Air relies on two related theories to reach this conclusion. First, it argues that T & S's failure to return the handles constituted acceptance or waiver, making T & S liable for the contract price of the entire installment. Secondly, Pic-Air contends that the failure to return the defective handles prevented cure, estopping T & S from objecting to the defects.

Pic-Air relies mistakenly on *C.W. Anderson Hosiery Co. v. Dixie Knitting Mills, Inc.* 204 F.2d 503 (4th Cir.1953), for the proposition that T & S accepted the handles and waived their defects by failing to return them. *Anderson Hosiery* explains that a buyer waives objections to defective goods by failing to "offer to rescind by returning the goods or placing them at the seller's disposal." 204 F.2d at 505, *quoting Reliance Varnish Co. v. Mullins Lumber Co.,* 213 S.C. 84, 95, 48 S.E.2d 653, 658 (1948). Similarly, the Uniform Commercial Code provides that upon rejecting goods a buyer must "hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them." U.C.C. § 2–602(2)(b) (1978). The buyer has no further obligations with respect to rightfully rejected goods. U.C.C. § 2–602(2)(c) (1978).

**2.** Title 36 of the South Carolina Code is numbered to correspond with the Uniform Commercial Code. S.C.Code Ann. § 36–1–101 (1976) provides that this title may be cited as the Uniform Commercial Code. For convenience, we will cite to the U.C.C.

The magistrate found that T & S had placed the goods at Pic-Air's disposal by inviting Pic-Air to inspect and sort the goods at T & S's facility. We agree that this invitation fulfilled T & S's immediate obligation to the seller. Consequently, T & S's failure to return the goods upon rejecting them was not acceptance or waiver.

Moreover, the magistrate correctly ruled that T & S was entitled to retain the defective handles after sorting them from the acceptable handles, because T & S held a security interest in the handles for the cost of inspecting and sorting them. The Code provides that a buyer has a security interest in rightfully rejected goods, to the extent of any expenses of inspection. Exercising this right, the buyer "may hold such goods" or may sell them. U.C.C. § 2–711(3) (1978); *Baeza v. Robert E. Lee Chrysler, Plymouth, Dodge, Inc.*, 279 S.C. 468, 472 n. 1, 309 S.E.2d 763, 766 n. 1 (App.1983) (dictum); *see also* U.C.C. § 2–715(1) (1978) (buyer's incidental damages for nonconforming goods include expenses of inspection).

Pic-Air contends that T & S's right to hold the rejected goods was subject to Pic-Air's right to cure. Pic-Air argues that, by failing to return the defective handles, T & S prevented Pic-Air from cure and therefore waived the right to object to defects.

As we pointed out, the magistrate properly found that T & S had rightfully rejected the defective handles. Pic-Air's tender of the third installment was nonconforming. A seller's right to cure a nonconforming tender is defined in two subsections of the Code. If the time for the seller's performance has not yet expired, the seller may notify the buyer of intent to cure and may then cure within the time of performance specified in the contract. U.C.C. § 2–508(1) (1978). In this case the third installment was due on July 6. Because Pic-Air did not cure by this date, this provision of the Code does not apply.

If the time for performance has passed, the seller's right to cure is limited. The seller must reasonably believe at the time of tender that the goods will be acceptable. After learning of the nonconformity, the seller must seasonably notify the buyer of intent to substitute a conforming tender. Upon satisfying these two requirements, the seller may then have a reasonable further time to substitute a conforming tender. U.C.C. § 2–508(2) (1978).

We assume that Pic-Air reasonably believed at the time of tender that the handles would be acceptable, because T & S had accepted prior installments. Pic-Air received notice of rejection on June 23 and inspected the shipment a few days later. Nevertheless, Pic-Air never unequivocally told T & S that it intended to cure. On June 29 and again on July 5, Pic-Air informed T & S that the handles were not defective. In late July and again in early August, Pic-Air conceded that some handles were scratched. But it neither acknowledged nonconformity nor undertook responsibility to cure, suggesting instead that its subcontractor would replace any handles that were in fact defective. Pic-Air cannot now insist on its right to cure, having never acknowledged the defects nor promised to cure them. *See Stephenson v. Frazier*, 399 N.E.2d 794, 797–98 (Ind.App. 1980) (seller's right to cure depends on seller's notifying buyer of intent to cure).

Pic-Air contends, however, that T & S could no longer rightfully retain the handles deemed defective after Pic-Air instructed T & S to return them.

We believe that T & S's refusal to follow these instructions did not constitute acceptance or waiver. The Code provides that a buyer's duty with respect to rightfully rejected goods in the buyer's possession is "to follow any reasonable instructions received from the seller with respect to the goods." This duty is subject to the buyer's security interest for inspection costs. Moreover, the seller's "[i]nstructions are not reasonable if on demand indemnity for expenses is not forthcoming." U.C.C. § 2–603(1) (1978). Beginning on June 29, Pic-Air consistently refused to pay the expenses of sorting. Pic-Air reiterated this

refusal in the August 8 letter of instructions. Because Pic-Air's instructions were unreasonable as a matter of law, T & S was not required to follow them. We conclude that T & S did not waive its right to object to the defects by continuing to hold the rejected handles rather than incur the additional expense of returning them, with no assurance of reimbursement. *See Deaton, Inc. v. Aeroglide Corp.*, 99 N.M. 253, 657 P.2d 109, 113–14 (1982) (buyer was not required to return defective goods on which it held a security interest, because seller did not tender the entire amount secured).

In sum, we hold that T & S rightfully rejected the defective handles, and it did not waive the right to object to their defects by refusing to return the handles. Consequently, the magistrate properly allowed a setoff for the defective handles and the cost of sorting them.

### IV

▉ Pic-Air also assigns error to the magistrate's determination that T & S was not liable for the contract price of the fourth installment, which Pic-Air never delivered. Pic-Air argues that it made constructive tender of this installment. Alternatively, Pic-Air contends that T & S repudiated the contract with respect to the final installment. Under either theory, Pic-Air contends that it is entitled to the contract price for the handles.

Pic-Air's theory of constructive tender is based on the proposition recognized in *Montague Corp. v. E.P. Burton Lumber Co.*, 136 S.C. 40, 45–47, 134 S.E. 147, 148–49 (1926), that attempted tender waylaid by the recipient is equivalent to actual tender. Pic-Air contends that its offer to ship the fourth installment C.O.D., upon T & S's authorization, was an attempted tender obstructed by T & S's refusal to authorize the shipment. Arguing that the C.O.D. term was a reasonable condition to tender, Pic-Air contends that the offer to ship was a valid tender that triggered T & S's obligation to pay the contract price. The magistrate found to the contrary that Pic-Air

had not proven tender in accordance with the contract.

Pic-Air relies mistakenly on *Ruscon Construction Co. v. Beaufort-Jasper Water Authority*, 259 S.C. 314, 191 S.E.2d 715 (1972), in asserting that the C.O.D. term was a reasonable condition to tender. The court in *Ruscon* stated in dictum that a reasonable condition does not vitiate tender. 259 S.C. at 320, 191 S.E.2d at 717. But the court ruled that a tender conditioned upon the recipient's signing a release of liability had been rightfully rejected, because the recipient had reasonably believed that he was not contractually required to sign the release. 259 S.C. at 321, 191 S.E.2d at 718. Thus, the conditional tender in *Ruscon* was not equivalent to tender.

The facts in *Ruscon* are comparable to those here. T & S could reasonably refuse to authorize a C.O.D. shipment because the contract specified that T & S had the right to reject C.O.D. shipments. Thus, Pic-Air's conditional offer to tender the goods was not a valid tender.

▉ Pic-Air also contends that T & S repudiated the contract with respect to the final installment by "refusing in advance to pay" for it. The sole evidence of anticipatory repudiation is contained in a letter of June 30, written by a vice president of T & S to summarize the meeting of June 27 concerning the defective handles. This letter recounted that T & S had assured Pic-Air that "we would be happy to take the parts provided they passed inspection," and added that "T & S could not make any further payments to Pic-Air until such time as this entire matter is cleared up." Pic-Air interprets the latter statement as anticipatory repudiation.

The magistrate interpreted these sentences, in context, as a demand for assurance. This interpretation is not clearly erroneous. *See L.E. Spitzer Co. v. Barron*, 581 P.2d 213, 217 (Alaska 1978) (anticipatory repudiation is a question of fact). The magistrate could reasonably conclude that T & S was not refusing in advance to pay

for handles not yet received, but refusing to pay for defective parts and for prior shipments, so long as Pic-Air had neither promised to return the tooling nor given adequate assurances of cure of the third installment and of conformity of the fourth. *Cf. Teeman v. Jurek,* 312 Minn. 292, 251 N.W.2d 698, 702 (Minn.1977) (buyer's withholding of payment did not constitute anticipatory repudiation because the withholding could be viewed as a setoff against buyer's damages for seller's breach).

■■■ T & S was entitled to demand such assurance. The defects in the June 22 shipment, amounting to about half the parts delivered, entitled T & S to demand assurance concerning the quality of the remaining installment. U.C.C. § 2–609(1) (1978). Moreover, Pic-Air's failure to give such assurance constituted repudiation. The Code provides: "After receipt of a justified demand, failure to provide within a reasonable time not exceeding thirty days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract." U.C.C. § 2–609(4) (1978). Pic-Air did not give adequate assurance within 30 days. "[W]here a delivery has defects ... which interfere with easy use by the buyer, no verbal assurance can be deemed adequate which is not accompanied by replacement, repair, money-allowance, or other commercially reasonable cure." U.C.C. § 2–609, reporter's comments at paragraph 4 (1978).

■■■ Because T & S was not obliged to accept a C.O.D. shipment and because Pic-Air failed to meet its obligation to give T & S timely and adequate assurance, the magistrate properly concluded that the obligations of T & S with respect to the remaining installment were ended. T & S therefore need neither accept delivery of the remaining installment nor pay its contract price.

## V

■■■ The contract originally placed the burden of shipping charges and the risk of delay on Pic-Air, by providing that shipping was to be "F.O.B. Destination" and that time was of the essence. *See* U.C.C. § 2–319(1)(b) (1978); 6 Williston, On Contracts § 846 at 181–82 (3d ed. 1962). Pic-Air contends, however, that T & S is liable for the air freight charges because T & S agreed to pay them in two modifications of the contract.

■■■ Although a contract modification need not be supported by consideration, U.C.C. § 2–209(1) (1978), the Code imposes an obligation of good faith upon all efforts to modify a contract. U.C.C. § 1–102(3) (1978). Good faith in this context requires that a "legitimate commercial reason" lead a party to seek the modification. *See* U.C.C. § 2–209, reporter's comments at paragraph 2 (1978). Courts have determined that a legitimate commercial reason is one outside the control of the party seeking the modification. *See, e.g., Weisberg v. Handy & Harmon,* 747 F.2d 416, 420 (7th Cir.1984) ("precipitous change in market price"); *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134, 147 (6th Cir. 1983) ("unforeseen economic exigencies").

■■■ Pic-Air contends that air freight became necessary for reasons outside Pic-Air's control. According to Pic-Air, T & S's delay in writing to confirm the price increase caused the delay in production.

The magistrate found that the delay in production was the fault of Pic-Air or its subcontractor. This finding is supported by the record. On March 29, T & S orally agreed to the price increase. On March 30, Pic-Air ordered production to begin. Thereafter, Pic-Air twice assured T & S that the installments would be delivered on time, only to retract these assurances and demand that T & S pay air freight. The magistrate properly concluded that the delay was not a legitimate commercial reason for the requested modification.

■■■ Pic-Air nevertheless argues that even if Pic-Air did not seek the modification in good faith, T & S cannot now object to the modification because T & S failed to

manifest any objection when it agreed to pay the air fares.[3] Pic-Air relies for this proposition on *United States ex rel. Crane Co. v. Progressive Enterprises, Inc.*, 418 F.Supp. 662, 665 (E.D.Va.1976), in which the court stated that the party seeking to rescind a modification must have "display[ed] some protest" at the time of assent.

*Crane* does not apply to the facts in this case. The modification in *Crane* had been sought in good faith. 418 F.Supp. at 664. In contrast the magistrate held that Pic-Air acted in bad faith because it had no legitimate commercial reason for modifying the contract. Consequently, *Crane* is not authority for requiring a protest to the modification of Pic-Air's contractual obligation to ship F.O.B. destination.

## VI

██ Finally, Pic-Air appeals the finding of conversion and the amount of damages.

The magistrate ruled that conversion occurred on April 14, the date of T & S's letter pointing out that Pic-Air had breached the clause requiring Pic-Air to notify T & S before subcontracting.

The refusal to return a chattel upon the demand of the rightful owner is conversion. *Roberts v. James*, 160 S.C. 291, 296–97, 158 S.E. 689, 692 (1931); *Causey v. Blanton*, 281 S.C. 163, 165, 314 S.E.2d 346, 348 (App. 1984). We find that the letter of April 14 did not constitute such a demand. The letter did not expressly demand that the tooling be returned. Nor can the letter reasonably be interpreted as a demand. At this point in the parties' relationship T & S still expected the first installment to arrive on May 6. Indeed, by letter of April 18, T & S confirmed an agreement to pay an increased price on all four installments. The vice president of T & S testified that his overriding concern at the time was that the parts be delivered. He also testified that he probably had told Pic-Air, "Let's finish the purchase order and get our tool back at the completion of this purchase

order." Pic-Air subsequently delivered three installments and T & S accepted two of these. Consequently, we find that on April 14 neither party considered the relationship to be at an end or contemplated the immediate return of the tooling. The earliest date of demand for the tooling, conceded by Pic-Air, is a telephone conversation on June 23 in which T & S requested return of the tooling.

Pic-Air contends that its possession of the tooling after June 23 was not conversion. Pic-Air argues that it could properly retain the tooling until it had fulfilled the purpose of the bailment. Consequently, Pic-Air argues, it rightfully retained the tooling for the purpose of curing the defective installment.

██ Pic-Air's argument fails, both under the common law of bailments and under the Uniform Commercial Code. At common law a bailee may make a qualified refusal to return the bailed item if the purpose of the bailment has not yet been fulfilled. But a bailee seeking to rely on a qualified refusal cannot thereby avoid liability for conversion unless he immediately communicates to the bailor the reason for the refusal to return the bailed item. *See, e.g., Stein v. Mauricio*, 580 S.W.2d 82, 83 (Tex.Civ.App.1979); *White v. Goldberg*, 12 N.J.Super. 122, 79 A.2d 95 (1951); Restatement (Second) of Torts § 241(b) (1965). Pic-Air did not notify T & S that it was retaining the tooling for the purpose of curing the June 22 shipment. Consequently, Pic-Air cannot avoid liability for conversion on this ground.

The same analysis applies to Pic-Air's right to cure under the Code. A seller's right to cure after the time for performance has passed depends on the seller's both notifying the buyer of intent to cure and curing within a reasonable time. U.C.C. § 2–508(2) (1978). Because Pic-Air did not preserve its right to cure by timely notice and cure, Pic-Air's continued possession of the tooling constitutes conversion.

---

**3.** The magistrate found that T & S agreed "reluctantly" and "under pressure" but did not address the issue of whether T & S manifested its reluctance to Pic-Air.

The party suing for conversion has the right to elect return of the chattel or damages. *Reynolds v. Philips*, 72 S.C. 32, 34, 51 S.E. 523, 524 (1905); *see also Alderman v. Cooper*, 257 S.C. 304, 310, 185 S.E.2d 809, 811 (1971). T & S elected damages.

In South Carolina the trier of fact has discretion to assess as damages for conversion the highest value of the property up to the time of trial. *Causey v. Blanton*, 281 S.C. 163, 166, 314 S.E.2d 346, 348 (App. 1984). The magistrate's award of $22,000, the purchase price of the tooling as originally quoted to T & S, did not abuse his discretion.

The judgment is affirmed, save that interest on Pic-Air's liability of $22,000 for conversion will run from June 23, 1983, the date of demand.