ASSOCIATED PRESS *v.* SOUTHERN ARKANSAS
RADIO COMPANY, d/b/a Radio Station KKOL, and
Wayne Brewies

CA 90-264                                    809 S.W.2d 695

Court of Appeals of Arkansas
Division I
Opinion delivered May 8, 1991

*Rollins & Ives*, by: *V. Benton Rollins*, for appellant.

*Worth Camp, Jr.*, for appellees.

JOHN E. JENNINGS, Judge. Appellant, the Associated Press,
a nonprofit membership corporation organized under the laws of

the State of New York, sued the appellees for breach of contract to provide news services. The trial judge awarded AP judgment for $848.43, the amount that appellees were in arrears on the contract at the time service was terminated, but denied AP's claim for $18,280.28 for loss of future profits, finding that the contract was unconscionable in this regard. The sole issue on appeal is whether the court erred in holding the contract unconscionable. We find no reversible error and affirm.

Wayne Brewies, an El Dorado resident, began operating radio station KKOL, under the name "Southern Arkansas Radio Company," in December of 1984 in Hampton, Arkansas. The station was physically located in a small house trailer. Brewies had previously worked for other radio stations, primarily as an announcer, but had no previous experience in operating a radio station. Although it appears that Brewies and his wife wanted to incorporate, it is undisputed that Southern Arkansas Radio Company is a partnership.

Hampton has a population of approximately 2,000. According to the testimony, the station was quite limited in power, having 100% coverage out to approximately twenty miles.

When KKOL began operations it had a contract with United Press International to obtain news. Brewies testified that during 1985, UPI ceased operations for Arkansas news and information. When this happened, Brewies called Mr. John Reeder of Little Rock. Reeder was an AP sales representative for Arkansas and had stopped by to talk with Brewies in Hampton while the station was still obtaining news services from UPI.

On or about June 11, 1985, AP agreed to provide news service to KKOL and installed the necessary equipment at the Hampton station.

On October 10, 1985, the parties entered into a written agreement. The two-page printed contract provided that the agreement would be effective as of June 11, 1985. It also included the following provision:

> If the member fails to pay the assessment as required under this agreement or otherwise breaches the provisions hereof, including the By-Laws, AP may suspend the Service or terminate this agreement. Upon such a suspen-

sion or termination the Member shall be liable to AP for the total amounts which otherwise would become due to AP under this agreement, including general assessment increases, if any, accruing after the Member's breach, during the balance of the term hereof, less the direct expenses which AP would incur in physically supplying the Service to the Member. . . .

The term of the agreement was five years. There was evidence to support the trial court's finding that, at the time the written agreement was entered into in October, 1985, Brewies was already behind in his payments to AP. Brewies explained that this was because the station was operating at a loss. Brewies, who had a high school diploma and two and one-half years of college, testified that he did not read the agreement before signing it, although he also testified that Mr. Reeder briefly reviewed it with him beforehand.

In early December 1985, AP terminated its service to KKOL for non-payment. Thereafter, the parties entered into settlement negotiations — AP through its general counsel, Rogers and Wells of New York, and Brewies on his own behalf. When a settlement could not be reached, this suit was filed.

In support of its claim for loss of future profits AP submitted the affidavit of Roger Sturm, its assistant treasurer. The affidavit and attached calculations showed a gross loss of revenue over the four and a half year period following termination of almost $30,000.00. In computing "net loss of revenue" the appellant deducted the following weekly expenses:

| | |
|---|---|
| Standard M-SAT charge | $ 19.56 |
| Okidata Teletype Maintenance | 7.75 |
| Okidata Teletype Amortization | .55 |
| M-SAT Amortization | 7.15 |
| Okidata Supplies | 13.95 |

Over the four and a half year period these expenses totaled approximately $11,500.00, leaving a "net loss" of $18,280.28.

The parties agreed at trial and in this appeal that the case is

governed by the Uniform Commercial Code.[1] Ark. Code Ann. §
4-2-302 (1987) provides:

> (1)   If the court as a matter of law finds the contract
> or any clause of the contract to have been unconscionable
> at the time it was made the court may refuse to enforce the
> contract, or it may enforce the remainder of the contract
> without the unconscionable clause, or it may so limit the
> application of any unconscionable clause as to avoid any
> unconscionable result.
> (2)   When it is claimed or appears to the court that
> the contract or any clause thereof may be unconscionable
> the parties shall be afforded a reasonable opportunity to
> present evidence as to its commercial setting, purpose, and
> effect to aid the court in making the determination.

■   A determination of unconscionability, under the code
or otherwise, appears to be a mixed question of law and fact. *See
Restatement (Second) of Contracts* § 208 comment f. On appeal
we will review the totality of the circumstances, *see Arkansas
Nat'l Life Ins. Co. v. Durbin*, 3 Ark. App. 170, 623 S.W.2d 548
(1981), but will reverse the trial court's decision only if it is
clearly erroneous. Ark. R. Civ. P. 52. In *Durbin* we said that in
determining whether a provision was unconscionable, "[t]wo
important considerations are whether there is a gross inequality
of bargaining power between the parties to the contract and
whether the aggrieved party was made aware of and compre-
hended the provision in question." We think that, under all of the
facts and circumstances of the case, the trial court could find a
quite significant difference in bargaining power as between the
parties. There is no evidence that these kinds of news services
were available in Hampton, Arkansas, from any entity other than
the Associated Press. Although relevant, the fact that both

---

[1] Unconscionability originated as an equitable doctrine. *See* 1 S. White & R.
Summers *Uniform Commercial Code* § 4-2 (3d ed. 1988). The doctrine has been
applicable in law courts in this state at least since the adoption of the Uniform Commercial
Code in 1961. Act 185 of 1961, § 2-302. In the case at bar, it is doubtful at best that Ark.
Code Ann. § 4-2-302 is strictly applicable, because Article 2 of the Code ordinarily applies
only to transactions in goods. Ark. Code Ann. § 4-2-102. Nevertheless, the Code section on
unconscionability has frequently been applied by analogy in non-Code settings. *See
Restatement (Second) of Contracts* § 208 comment a (1979).

parties here are merchants will not preclude a finding of unconscionability. *See Kohlenberger, Inc.* v. *Tyson Foods, Inc.*, 256 Ark. 584, 510 S.W.2d 555 (1974); Mallor, *Unconscionability in Contracts Between Merchants*, 40 Sw.L.J. 1065 (1986).

█ We agree with the general proposition that "[i]t is not the province of the courts to scrutinize all contracts with a paternalistic attitude and summarily conclude that they are partially or totally unenforceable merely because an aggrieved party believes that the contract has subsequently proved to be unfair or less beneficial than anticipated." *Geldermann and Co., Inc.* v. *Lane Processing, Inc.*, 527 F.2d 571 (8th Cir. 1975). Nevertheless, on the facts of the case at bar, we cannot say that the trial court's determination that the provision in question was unconscionable was clearly erroneous. The agreement is a preprinted form; the provision relating to loss of future revenue is harsh in its operation; the contract was signed at a time when the appellee was already in default under its terms; and there appears to be a substantial disparity in the relative bargaining power of the parties.

Appellant argues that its budgets are prepared several years in advance and are computed by taking into account revenue anticipated from its various contracts. While these statements may be true, no support for them may be found within the record on appeal.

Appellant also relies on *Associated Press* v. *Emmett*, 45 F. Supp. 907 (S.D. Cal. 1942). There, a federal district court upheld, under California law, a provision in an Associated Press contract which allowed AP to recover two years worth of assessments in the event of a breach. The contention in *Emmett*, however, was that the contractual provision amounted to a penalty as opposed to being reasonable liquidated damages. Therefore, *Emmett* is not only distinguishable factually from the case at bar, but the court also proceeded under a different legal theory.

Our conclusion is that the trial court's finding of unconscionability is not clearly erroneous.

Affirmed.

CRACRAFT, C.J., and DANIELSON, J., agree.