**EL PASO NATURAL GAS COMPANY, Appellant,**

v.

**MINCO OIL & GAS COMPANY & Charles F. Doornbos, as Trustee for the Charles F. Doornbos Revocable Trust, Appellees.**

No. 07–96–0210–CV.

Court of Appeals of Texas, Amarillo.

Dec. 10, 1997.

Rehearing Denied Jan. 15, 1998.

Opinion Modified on Rehearing in Part April 8, 1998.

**58**

Akin, Gump, Strauss, Hauer & Feld, L.L.P., S. Shawn Stephens, Michael K. Swan, P.C., Houston, El Paso Natural Gas Company, Barbara Harrell, El Paso, for appellant.

Templeton, Smithee, Hayes & Fields, John Smithee, Joe W. Hayes, Amarillo, for appellees.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

QUINN, Justice.

El Paso Natural Gas Company (El Paso) appeals from a final judgment awarding Minco Oil & Gas Company (Minco) and Charles F. Doornbos, as trustee for the Charles F. Doornbos Revocable Trust, (Doornbos) damages against it. Through three points of error, El Paso raises questions regarding unconscionability, breached duty of good faith, and the sufficiency of the evidence. By cross-point, Doornbos decries the trial court's refusal to find that the life of a particular contract was extended past its original term. We reverse in part and affirm in part.

### Background

The dispute revolves around take-or-pay gas purchase agreements executed in 1979 (1979 Agreements) by El Paso, and the predecessors of Doornbos, and Minco.[1] Under

---

1. The Doornbos' claims arose from a contract executed between Foster Petroleum Company and El Paso in 1979. When Foster Petroleum dissolved in the mid–1980's, its interests and assets (including the property subject to the Foster/El Paso contract) were placed in trust for the

these agreements, Doornbos and Minco dedicated to El Paso all the natural gas which could be produced from their properties located in Hemphill County, Texas. In turn, El Paso agreed to purchase a specified minimum quantity (80% "of the aggregate maximum delivery capacity of the Seller's wells") per day. If it failed to purchase same or if it bought an amount less than the minimum quantity, then El Paso was obligated to pay Doornbos and Minco the difference between the amount actually taken and the minimum quantity it was required to take; thus, arose the concept of take-or-pay.

For several years after the 1979 Agreements were executed, all parties performed as expected. Then, the natural gas market began to experience change in the mid–1980's. To put it mildly, gas prices fell substantially. Soon El Paso realized that to continue acquiring the gas as required under the 1979 Agreements would be unprofitable and, in time, it obtained from Minco and Doornbos various amendments to the Agreement. Those amendments (referred to as the Amendatory Agreements) retroactively altered El Paso's take-or-pay obligation from 80% to 50% of the sellers' "aggregate daily producing ability" for the period of January 1, 1982, through December 1984, and from 80% to 60% for the period "from and after January 1, 1985," through the end of the contract term. So too was the buyer granted the right to unilaterally reduce the price it paid for the gas.[2] Finally, if the buyer decided to reduce the price to a level unacceptable to Minco and Doornbos, the two producers had the chance to end "this Agreement" but only after all obligations due El Paso were satisfied.

In addition to the foregoing amendments, approximately 80 other contracts were executed between the parties over the remaining terms of the 1979 Agreements. These other contracts (referred to herein as the Monthly Releases) 1) released El Paso from its monthly obligation to take-or-pay, 2) extended to Minco and Doornbos the opportunity to sell their gas on the spot market during the pertinent period often at a lesser price, and 3) gave El Paso the option to reduce its annual take-or-pay obligation by the amount of gas they sold on the spot market or to simply ignore its obligation for the month covered by the contract.

In time, Minco grew dissatisfied with its relationship with El Paso and requested that it be ended. Consequently, in November of 1988 the two entities signed a letter (the November Termination Letter) terminating the 1979 Agreement and releasing each other of any and all claims or causes of action which they may have had against each other.[3] Several more years passed before El Paso obtained, in February of 1991, two termination letters (February Termination Letters) from Doornbos and his predecessors in interest. They, like the November Termination Letter, also purported to waive "[a]ll past liabilities that might exist between the parties."

More time passed before Minco and Doornbos learned that others had begun asserting take-or-pay claims against El Paso. Thus, they too joined the fray and sued the company to recover sums equal to the take-or-pay obligations thought due them under the unamended 1979 Agreements. Though the causes of action averred were numerous, only three concern us for they were the claims upon which the court awarded dam-

benefit of Doornbos and two of his kin. Eventually, the interests were disbursed from that trust. Thereafter, Cross–Timbers Partnership eventually acquired the property interests of Doornbos' kin encompassed by the Foster/El Paso contract. After this had occurred, Doornbos obtained an assignment from Cross–Timbers of any claims which may have arisen under the Foster/El Paso contract against El Paso and combined them with his own to form the basis of the suit at bar. To avoid possible confusion which may arise from this tangled line of players, however, we simply label all of Doornbos' predecessors in interest as Doornbos.

2. Whether the price would be reduced was dependent upon the existence of a governmental order prohibiting El Paso from paying the price or the buyer's "good faith" determination that "its gas supply and market demand environment indicate[d] a downward change in the value to Buyer of the gas to be purchased from Seller." Moreover, El Paso retained the "sole discretion" to make that decision.

3. Though some claims were retained, they did not encompass those here at issue.

ages. The first is breach of contract. As to this allegation, it was determined that El Paso failed to perform its take-or-pay obligations as per the original 1979 gas purchase agreements. However, before recovery could be had upon that claim, the court had to set-aside the Amendatory Agreements, Monthly Releases, and the November and February Termination Letters. It did so by first holding all of them unconscionable. Then, it concluded that all but the February Termination Letters were obtained by El Paso in violation of its duty of good faith. As a result, El Paso was ordered to pay Minco and Doornbos damages equal to the amount of gas which it agreed to take-or-pay for under the unamended 1979 Agreement.

On appeal, the true issue is not whether El Paso breached the 1979 Agreements. Rather, it concerns whether the other contracts and releases were properly voided so that the claim of breached contract could be pursued. And, of paramount importance is whether the November and February Termination Letters were properly negated. Again, they released El Paso from all claims and liability. So, if they remained binding, it mattered not whether any of the other Agreements were avoidable.

### Point of Error One—Unconscionability

In its first point of error, El Paso attacks the trial court's decision to avoid the release agreements on the basis of unconscionability. It posits that same were not unconscionable as a matter of law. So too does it argue that the court's "Findings of Fact/Conclusions of Law Nos. 5–16," which purportedly involved unconscionability, were legally or factually insufficient.[4] We sustain the point.

### A. Controlling Law

■ As per the Texas Business and Commerce Code, a court may refuse to enforce a contract which it holds unconscionable. TEX. BUS. & COM.CODE ANN. § 2.302(a) (Vernon 1994). Yet, a problem arises in determining what is encompassed within the theory. Those who codified the concept into section 2.302 did not deign to define it; nevertheless, we are not without guidance. Both the commentary following the provision and the writings of our judicial brethren provide assistance. *See Lockhart Sav. & Loan Ass'n v. RepublicBank Austin,* 720 S.W.2d 193, 195 (Tex.App.—Austin 1986, writ ref'd n.r.e.) (stating that while the comments accompanying each section of the Business and Commerce Code are not law, they nevertheless are persuasive authority concerning the legislature's intent).

### 1. Standard of Review

■ We are told that the ultimate question as to whether an agreement is unconscionable is one of law. *Id.* at § 2.302, cmts. 1 & 3; *Pony Express Courier Corp. v. Morris,* 921 S.W.2d 817, 820 (Tex.App.—San Antonio 1996, no writ). This suggests that our review of the matter is *de novo.* Yet, it cannot be forgotten that the decision of whether some agreement is or is not unconscionable is dependent upon the existence of facts which allegedly illustrate unconscionability. And, as to the existence of those facts, our review is not *de novo.* In other words, we cannot review the record, divine our own inferences from the evidence contained therein, resolve conflicts in same, or decide what evidence to believe and what not to believe. The power to do those things, that is, to find facts, lies with the trial court. Once it has exercised that power, we must then defer to the findings made. And, as long as the findings enjoy sufficient evidentiary support, they cannot be disturbed, even though we may have construed the evidence differently. Nevertheless, this does not prevent us from assessing whether the findings made illustrate unconscionability for, again, that is a question of law. Nor does it prevent us from deciding whether the evidence of record, when viewed in a light most favor-

---

4. The findings and conclusions referred to were those located in transcript "Vol. 18, pp. 001090–001095," according to El Paso. Yet, those particular findings and conclusions deal with good faith/bad faith, the availability of "FERC 500 credits," and damages, not unconscionability. Thus, we conclude that El Paso mistakenly referred to them and actually intended to allude to the findings and conclusions at Second Supplemental Transcript, pp. 02–12 (filed September 16, 1996).

able to the court's findings and regardless of its potential inferences, illustrates unconscionability, for that too is a question of law.

Interestingly, at least one court has likened the mental gymnastics in which we must partake to the standard of abused discretion. *See, e.g., Pony Express Courier Corp. v. Morris,* 921 S.W.2d at 820. Use of the latter is helpful in situations involving mixed questions of law and fact, according to the *Pony Express* court. *Id.* It enables the reviewing court to reassess *de novo* that part of the decision involving the law and its application while recognizing the trial court's authority to weigh and interpret the evidence. *Pony Express Courier Corp. v. Morris,* 921 S.W.2d at 820; *accord, Walker v. Packer,* 827 S.W.2d 833, 839–40 (Tex.1992); *see Restatement (Second) of Contracts* § 208, cmt. f (stating that the appellate court will consider whether the proper standards were applied). Given this, we too adopt it as indicative of the framework in which the reviewing court must act.

### 2. The Scope of Unconscionability

 According to those who incorporated it into chapter two of the Texas Business and Commerce Code, unconscionability serves the purpose of negating an advantage gained through oppression and unfair surprise. TEX.BUS. & COM.CODE ANN. § 2.302, cmt. 1. At one time, it was perceived as a way of protecting the downtrodden against the overpowering. Though the concept has changed somewhat, it nevertheless retains many of its historic characteristics. For instance, it must be shown that the agreement in question arose through procedural and substantive abuse. *Tri–Continental Leasing Corp. v. Law Office of Richard W. Burns,* 710 S.W.2d 604, 609 (Tex.App.—Houston [1st Dist.] 1985, writ ref'd n.r.e.); *Wade v. Austin,* 524 S.W.2d 79, 85 (Tex.Civ.App.—Texarkana 1975, no writ).[5] The former means that

oppression and unfairness must taint the negotiation process leading to the agreement's formation. *Pony Express Courier Corp. v. Morris,* 921 S.W.2d at 821. And, this is illustrated through such things as 1) the presence of deception, overreaching, and sharp business practices, *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Westinghouse Electric Corp.,* 844 F.2d 1174, 1184 (5th Cir.1988), 2) the absence of a viable alternative, *Wade v. Austin,* 524 S.W.2d at 86, and 3) the relative acumen, knowledge, education, and financial ability of the parties involved. *Restatement (Second) of Contracts* § 208, cmt. d. Furthermore, no one indicia is determinative; rather, the totality of the circumstances must be assessed before it can be said that someone fell prey to procedural abuse. 2 R. Anderson, *Uniform Commercial Code* § 2–302:32 (3d ed.1982). Moreover, the situation must be assessed as of the time it occurred, not via hindsight. *Tri–Continental Leasing Corp. v. Law Office of Richard W. Burns,* 710 S.W.2d at 609; *Wade v. Austin,* 524 S.W.2d at 85.

 As to the latter prong, that concerning substantive abuse, the fairness, or oppressiveness of the contract itself is considered. *Pony Express Courier Corp. v. Morris,* 921 S.W.2d at 821. Admittedly, this prong is not easily quantified for the notions of fairness and oppressiveness themselves elude ready grasp. What may be fair in one scenario may not be in another. Thus, the totality of the situation (as of the time the situation unfolded) must again be measured. Furthermore, at least one commentator suggests that the contract, with its promises, benefits and detriments, must border on being inimical to public policy before it can be said to be sufficiently unfair or oppressive. 2 R. Anderson, *Uniform Commercial Code* § 2–302:28 (comparing unconscionability to con-

---

5. Incidentally, authority indicates that both prongs must be present. *Arkwright–Boston Mfrs. Mut. Ins. Co. v. Westinghouse Electric Corp.,* 844 F.2d 1174, 1184 (5th Cir.1988); *Wade v. Austin,* 524 S.W.2d 79, 86 (Tex.Civ.App.—Texarkana 1975, no writ). Yet, at least one commentator discounts the use of the two-pronged analysis, 2 R. Anderson, *Uniform Commercial Code* § 2–302:43 (3d ed.1982) and suggests that an ap-

proach based upon the totality of the circumstances is more beneficial. *Id.* at § 2–302:32 & 2–302:43. We admit that there is an interrelationship between the indicia used under both prongs and agree that the assessment should be made based upon the totality of the circumstances. Yet, the two-pronged analysis is a way of categorizing the pertinent factors and, to that extent, it is useful.

cerns of public policy). Others suggest that it must be utterly lopsided, that is, there must be no reasonable or subjective parity between the values exchanged.[6] *Wade v. Austin,* 524 S.W.2d at 86; *Restatement (Second) of Contracts* § 208, cmt. c; 2 R. Anderson, *Uniform Commercial Code* § 2–302:53 (suggesting that the terms of the agreement must bear a reasonable relationship to the risks involved).

■ Yet, regardless of grounds proffered as illustrative of substantive abuse, they must be sufficiently shocking or gross to compel the courts to intercede. Indeed, the same must be said *vis-a-vis* procedural abuse; the circumstances surrounding the negotiations must be shocking. Anything less would be an invitation to excessive governmental intrusion into our dealings. Our court system cannot act as the mother hen watching over its chicks, standing ready to ameliorate every unpleasant circumstance which might befall them. *See Associated Press v. Southern Arkansas Radio Co.,* 34 Ark.App. 211, 809 S.W.2d 695, 697 (1991) (noting that it is not the province of the courts to scrutinize all contracts with a paternalistic attitude and summarily discard them because one may consider them no longer beneficial or fair). One's right to negotiate a bargain, to exercise free will, to choose a path, and to even make a bad deal must be admitted and respected. 2 R. Anderson, *Uniform Commercial Code* § 2–302:29. After all, the general responsibility to fend for one's self still lies with one's self. Consequently, only when the negative aspects of the bargaining process and subsequent contract are *gross,* under the totality of the circumstances, is the court's authority to intercede triggered. *Restatement (Second) of Contracts* § 208, cmt. d.

■ Similarly, it is imperative that the complaining party fall prey to those gross aspects of the deal. That is, the circumstances before him must be such as to compel him to execute the bargain. *See Troy*

*Mining Corp. v. Itmann Coal Co.,* 176 W.Va. 599, 346 S.E.2d 749, 754 (1986) (rejecting the claim of unconscionability due to the lack of evidence indicating that the contract was "forced" upon the complainant); *Wade v. Austin,* 524 S.W.2d at 86 (stating that one who "knowingly" enters an improvident contract cannot be heard to complain); *Earman Oil Co., Inc. v. Burroughs Corp.,* 625 F.2d 1291, 1299 (5th Cir.1980) (indicating that one who knowingly and "willingly" enters an agreement is not a victim of gross conduct). Again, if the complainant did what he did because of his own motivations, and not those of his opponent, then he must suffer the result of his deal.

■ Lastly, and to the extent that El Paso argues otherwise, section 2.302 of the Business and Commerce Code does not limit its protections to only those involved in personal, as opposed to commercial, transactions. The doctrine has been invoked with success in the latter setting. Indeed, *Campbell Soup Co. v. Wentz,* 172 F.2d 80 (3rd Cir.1948), a case cited by the legislature in the comments following section 2.302 as indicative of unconscionability, is one such example. There, the court struck down a contract which obligated Wentz, a farmer, to dedicate his entire crop to Campbells even if Campbells did not take or pay for it. That transaction was commercial, as was the deal in *Art's Flower Shop, Inc. v. Chesapeake and Potomac Telephone Co.,* 186 W.Va. 613, 413 S.E.2d 670 (1991) (wherein a merchant successfully invoked the doctrine against a telephone company). In citing *Wentz,* it can be said that the legislature did not intend to *ipso facto* exclude commercial transactions from the realm of unconscionability. And, we are not in a position to do that which the legislature has not done. *See Associated Press v. Southern Arkansas Radio Co.,* 809 S.W.2d at 697 (recognizing that the theory of unconscionability may have application to some commercial transactions); J. Mallor, *Unconscionability in Contracts Between*

---

**6.** Parity must be gauged by more than objective criteria. For instance, while a reasonable person may think it ridiculous to pay thousands of dollars for a three-legged bull, a rancher who subjectively thinks that the stamina exemplified by a three-legged bull is a genetic characteristic worthy of breeding may be quite willing to pay that price. And, who's the law to say that the rancher should not be allowed to act upon his personal beliefs and pay that price.

*Merchants,* 40 Sw.L.J. 1065 (1986) (concluding the same).

■ Of course, we acknowledge that a claimant's status as a merchant or businessman may be considered in the overall equation. Indeed, the expertise, knowledge, financial strength and such possibly garnered by a businessman may be enough to warrant the conclusion that he or she did not fall prey to supposedly unconscionable activity. *See, e.g., DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 333 (7th Cir.1987) (refusing to uphold DeValk's claim of unconscionability because of DeValk's extensive business experience, knowledge, and use of legal counsel).

### B. Application to Case

As previously mentioned, the trial court held unconscionable those portions of the November Termination Letter which effectively waived Minco's claims against El Paso. It did so because of:

■ El Paso's admitted policy that it did not voluntarily make take-or-pay payments ... as well as its express and implied representations that it was not obligated to purchase minimum contractual amounts of gas or to pay take-or-pay damages ... and the overall advantage of bargaining power held by El Paso ... [and]

■ Minco was required to release all contractual take-or-pay obligations of El Paso in order [to] be able to sell any of its gas ... which El Paso was refusing to purchase....

So too were the provisions of the February Termination Letters which waived liabilities against El Paso avoided. The reasons given, however, differed. Those agreements were set aside because

■ [they] represent that it "may be in the best interests of all parties" to sign the agreements and because the stated purpose of the letters [was] the early termination of, in part, the McMordie contracts, and because according to El Paso's own records, the McMordie contracts would terminate at the approximate same time whether Doornbos and Cross–Timbers signed the letters or not [and]

■ the effect of such a release of past take-or-pay damages without any corresponding benefit to Plaintiffs ... [was] so one-sided....

We now turn to the question of whether these were sufficient to establish unconscionability.

### 1. Minco Release

### a. Procedural Abuse

■ We initially note that the court said nothing of Minco's business expertise, financial status, and overall knowledge of the oil and gas trade. Nor did it comment upon the viable alternatives, if any, which were available. To the extent that these factors went unconsidered, it can be said that the court failed to assess the totality of the circumstances as required. And, in not doing that, the court abused its discretion. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986) (holding that an abuse of discretion arises when the court violates controlling principles or deviates from guiding rules). Similarly absent is consideration of whether the indicia cited by the court compelled Minco to do what it did. That too indicates analysis of less than the totality of the circumstances and abused discretion.

Next, the supposed policy referred to by the trial court as illustrative of procedural abuse was used prior to execution of the Amendatory Agreements. Whether it was still in existence three years later when Minco signed the November Termination Letter cannot be garnered from the evidence before us.

Moreover, the record undisputably demonstrates that the subject of terminating the 1979 Agreement was first broached by Minco's president, Gene Hall. He believed it "prudent" to sell his gas and grew frustrated with what he perceived to be El Paso's persistent refusal to live up to its agreement. As he stated at trial:

You know, I finally reached the point, I believe ... I believe it was in '88 or along there that they [El Paso] hadn't taken gas

in some time period. They just hadn't been taking gas.

And so, at that point I realized that I wasn't going to be able to sell any gas and so, I asked for a release.

The release was needed, Hall testified, to insulate any potential new buyers from suit by El Paso. So, he proposed to El Paso that the relationship between it and Minco come to an end. El Paso responded by drafting the November Termination Letter which included a mutual release of claims. Upon receiving the document, Minco signed it, and within days, the producer had contracted to sell its gas to another company. It may be that El Paso had superior bargaining position due to its size, pocketbook, and ability to prevent sales to third-parties. Yet, we were cited to no evidence, nor did we find any, indicating that Minco objected to the release provision in the November Termination Letter. Nor is there any evidence indicating that it sought to renegotiate that language. Under this state of the record, it can hardly be said that Minco fell prey to El Paso's bargaining power when it did not attempt to test that power or when it simply acquiesced to El Paso's preferences.

Interestingly, the November Letter was not the first contract drafted by El Paso and signed by Minco which contained release provisions. Many such instruments had been executed by the producer since 1985. That the documents also had the effect of releasing or minimizing El Paso's take-or-pay liability was something about which Minco was not "too concerned," despite being "real disappointed" with El Paso. *See Resources Investment Corp. v. Enron Corp.*, 669 F.Supp. 1038, 1042 (D.Colo.1987) (holding that multiple releases contained in 32 contracts signed over an 18 year period would indicate a *lack* of unconscionability).

Additionally, nothing of record indicates that Minco failed to understand the effect of its actions in executing the November Termination Letter. Its president, Hall, was a sophisticated businessman. He had graduated from college, become a certified public accountant, and began acquiring oil and gas interests at least five years before incorporating Minco in the 1960's. Moreover, his venture into the oil patch was sufficiently profitable to induce him, in the 1970's, to leave his accounting practice and pursue the oil trade full-time. And, throughout his career as a professional, he not only drafted various business instruments but knew enough to hire attorneys to draft those which he could not. These circumstances coupled with his admission that he knew what the concept of waiver meant belie any notion that Hall was something less than an astute businessman. It may be, as Minco suggested in its brief, that Hall did not know the extent, if any, of El Paso's potential liability before signing the November Termination Letter. Yet, the undisputed evidence illustrates that not only was Hall disappointed with El Paso's performance but also that he never attempted to investigate the extent of El Paso's potential liability until long after signing the releases.

Furthermore, there existed options to waiving the claims. At the very least, Minco could have tried to end the relationship without releasing El Paso. Or, it could have acted upon its "real disappointment" with El Paso and demanded that El Paso perform. If it did not, then Minco could have also done that which it postponed until the 1990's, that is, sue. After all, when El Paso sent the Termination Letter, Minco stood at the precipice. At that point, Minco could no longer delay the inevitable. It had to decide whether to sign the release or convert its frustration with the company into a law suit. Contrary to Minco's insinuations to the contrary, a lawsuit can be a very viable option when one is finally faced with the choice of either waiving claims or suing upon them.

In sum, we hold that in failing to consider the totality of the circumstances, the trial court abused its discretion in finding that El Paso engaged in gross procedural abuse. So too do we conclude, as a matter of law, that the indicia relied upon by the trial court were alone not enough to illustrate gross procedural abuse. We also find, as a matter of law, that under the totality of the circumstances, Minco did not succumb to any gross procedural abuse in executing the November Termination Letter.

### b. Substantive Abuse

 As to the question of substantive abuse, the trial court found same in the fact that Minco had to purportedly release its causes of action before it could sell to other buyers. Though that may be a distasteful option, we hold as a matter of law, that it was not enough to render the release an instance of substantive abuse or an act approaching the violation of public policy. First, there is nothing inimical in releasing claims. Indeed, that is done most every time a legal controversy is settled. Second, in exchange for the release, Minco gained the opportunity to sell its gas to third-parties without hindrance from El Paso. That, in the words of Minco's president, was a "prudent" goal to pursue. Third, Minco undoubtedly considered the claims unimportant *at the time* since it did not even attempt to investigate their potential existence or extent.[7] Fourth, and as previously discussed, Minco had the option to pursue those claims rather than release them. Given the totality of the circumstances which went unmentioned by the court, we conclude that the latter abused its discretion in finding that Minco was the victim of substantive abuse.

### 2. Doornbos/Cross–Timbers Releases— February Termination Letters

### a. Procedural Abuse

As previously mentioned, the trial court found that the February Termination Letters were the result of procedural abuse because 1) El Paso represented in the documents that it "may be in the best interests of all parties' to sign the agreement," 2) "the stated purpose of the letters [was] the early termination of, in part, the McMordie contracts," and 3) "according to El Paso's own records, the McMordie contracts would terminate at the approximate same time whether Doornbos and Cross–Timbers signed the letters or

not." As can be seen, the trial court did not address the relative bargaining strength of the parties at the time the items were signed or their relative business acumen, knowledge, education, or financial ability. Nor did it discuss the presence or absence of viable business alternatives. To the extent that all these factors were ignored, the court did not permissibly exercise its discretion.

More importantly, it could not be said that the ability of Doornbos or Cross–Timbers to sell gas to others was conditioned upon the execution of either document. Indeed, other findings of the trial court revealed that the producer/buyer relationship once existed between El Paso, and Cross–Timbers ended approximately 14 months before execution of the 1991 releases. So, no approval was needed from El Paso to market their gas elsewhere. Similarly non-existent is evidence indicating that either Doornbos or Cross–Timbers read the releases before signing them, relied upon anything mentioned therein as inducement to sign them, objected to signing the documents, attempted to negotiate the terms of the documents, or felt compelled in any way to sign them for any particular reason. And, though we have no information of record about the financial or educational background of the Cross–Timbers partners or evidence of their relative business acumen, the evidence undisputably characterizes Doornbos as a college educated man of "considerable" wealth, learned in the oil and gas trade, and careful about his business and what he signed. It further depicts him as someone who had sold gas to and dealt with a number of interstate pipelines in his career and knew how and when to obtain legal counsel.

Given the dearth of evidence regarding compulsion by El Paso or reliance upon anything the company said to induce execution of the 1991 releases, as well as the general

---

7. In this regard, we encounter no evidentiary value in the testimony that Minco would never have signed the releases had it known of potential claims against El Paso. The latter had no duty to confess liability for breached contract or otherwise relinquish its arguably viable defenses before suit was filed, though in a utopian society such would be nice. Rather, Minco had the affirmative obligation to protect and pursue its

own rights and interests. This encompassed the duty to investigate potential claims on its own behalf. Yet, despite its long standing concern over El Paso's non-performance, Minco did nothing to investigate the validity of El Paso's representations or the extent of its potential liability. One cannot witness potential wrong to himself, close his eyes to it, and then claim foul once the opportunity to sue has vanished.

absence of evidence illustrating lack of viable alternatives, business acumen, financial ability, and knowledge about what was being signed and its effect, the things cited by the trial court as illustrating procedural abuse are inconsequential. So, we hold as a matter of law, that under the totality of the circumstances the court's finding of gross procedural abuse emanated from an exercise of abused discretion.

### b. Substantive Abuse

■ Next, the court found that the 1991 termination letters were illustrative of substantive abuse since they were "one-sided," that is, they effectively released "past take-or-pay damages without any corresponding benefit to" Doornbos or Cross–Timbers. To the extent that the 1979 Agreement had long since expired and the two producers were free to sell to whomever they chose, it can be said that they got little value in return for releasing El Paso of its potential take-or-pay liability. Yet, as previously mentioned, there is nothing inherently wrong in release agreements. Nor was the incorporation of the waiver terminology such that it could have escaped attention or been misunderstood.[8] And, given the general want of procedural abuse, we hold as a matter of law, that the absence of a *quid pro quo* was not enough to raise the transaction from the realm of a bad deal into that of unconscionability.

### c. Conclusion

In sum, neither the November nor February Termination Letters, or their release provisions, were unconscionable under the totality of the circumstances. In holding that they were, the trial court abused its discretion. Finally, because each document effectively waived the take-or-pay claims which Minco and Doornbos pursued herein against El Paso, we need not determine whether any other release or modification agreement was unconscionable. So, El Paso's first point of error is sustained.

8. Incidentally, the trial court determined that the terminology which purported to waive the take-or-pay claims was ambiguous. We disagree. The phrase " '[a]ll past liabilities that might exist between the parties are waived' " is not susceptible to reasonable alternative interpretations. It

### Point of Error Two—Good Faith

In its second point, El Paso attacks the finding that it acted in bad faith *vis-a-vis* execution of the amendatory agreements, monthly release letters, and termination letters. The findings were wrong because 1) it allegedly owed no duty of good faith or, in the alternative, 2) they lacked evidentiary support. We overrule the point.

As to the contention involving insufficient evidence, we note that El Paso's point of error itself does not actually mention it. Nevertheless, a substantial portion of the argument under point two is expressly devoted to the topic. Given this and the Supreme Court directive to liberally apply the briefing rules, *Anderson v. Gilbert*, 897 S.W.2d 783, 784 (Tex.1995), we must construe the point as encompassing a sufficiency attack. The next problem, however, entails the type of attack waged; that is, is it one upon the legal or factual sufficiency of the evidence. El Paso affords us little guidance since it fails to reference an applicable standard of review. But, since it cites only to evidence favoring its position and that such evidence can only be considered when questioning the factual sufficiency of a determination, we conclude that its attack is one of factual sufficiency.

Next, our consideration of this point is restricted to the claim of Minco. Simply put, the trial court did not find that the February Termination Letters signed by Doornbos and Cross–Timbers were obtained in bad faith. Indeed, the only ground upon which it relied to avoid those documents was unconscionability. And, since we have found that the releases were not unconscionable, there are no Doornbos claims left for us to address.

### A. Duty of Good Faith

■ El Paso correctly argues that whether one has a duty to act in good faith is a question of law. So too is it correct in saying that no general duty of good faith

means just what it says, *all* potential liabilities were waived. And, to the extent that El Paso owed take-or-pay claims, same would have been a liability of El Paso encompassed by the terms of the release.

exists between parties to a contract. *Arnold v. National County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex.1987). Yet, the rule is not without exception. For instance, one who stands in a special, confidential, or fiduciary relationship with another may owe the latter a duty of good faith. *See, e.g., Aranda v. Ins. Co. of North America*, 748 S.W.2d 210 (Tex.1988) (imposing a duty of good faith and fair dealing upon insurance companies in dealing with their insureds). Or, statute may impose upon one such an obligation. And, it is the latter situation that concerns us here.

The court's findings of fact and conclusions of law, dated October 23, 1995, allude to the concept of good faith as espoused in sections 1.203 and 2.103(a)(2) of the Texas Business and Commerce Code. Under the former, one must act in good faith *vis-a-vis* the performance of that transaction. TEX.BUS. & COM.CODE ANN. § 1.203 (Vernon 1994). In turn, the latter proviso, that is § 2.103(a)(2), obligates those who happen to be merchants to act with "honesty in fact" and to observe "reasonable commercial standards of fair dealing in the trade." *Id.* at § 2.103(a)(2).[9] Additionally, the duties apply not only to the performance of the contract but also to the formation and modification of those agreements. TEX.BUS. & COM.CODE ANN. § 2.209, cmt. 2.

▪ Next, to fall within the ambit of § 2.209 of the Business and Commerce Code, the transaction in question must be one involving goods. TEX.BUS. & COM.CODE ANN. § 2.209(a) (stating that the provision applies to the modification of "a contract *within this chapter*"); *Id.* at § 2.102 (stating that the "chapter" affects nothing other than "transactions in goods"). The buying and selling of oil and gas is such a transaction. *Howell Crude Oil Co. v. Tana Oil & Gas Corp.*, 860 S.W.2d 634, 637 (Tex.App.—Corpus Christi 1993, no writ); *New Bremen Corp. v. Colum-*

*bia Gas Transmission Corp.*, 913 F.Supp. 985, 987 (S.D.Tex.1995). So, El Paso is wrong when it posits that it had no duty to act in good faith *vis-a-vis* the modification and performance of the many agreements at bar.

▪ However, breaching the Business and Commerce Code duty of good faith does not provide the injured with an independent cause of action for damages. TEX.BUS. & COM.CODE ANN. § 1.203, cmt. Rather, the complainant may use the wrong to vitiate the agreement tainted by bad faith. For instance, if one used bad faith to secure modification of an agreement, then sections 1.203 or 2.103 could be invoked as a way of avoiding the modification and enforcing the original agreement. *Id.*

▪ Next, whether the duty has been breached depends upon several factors. For instance, the presence or absence of a legitimate commercial reason for pursuing modification is one indicia, assuming the parties are merchants. *See* TEX.BUS. & COM.CODE ANN. § 2.209, cmt. 2 (stating that the "extortion of a 'modification' without legitimate commercial reason is ineffective as a violation of the duty of good faith"); *T & S Brass & Bronze Works, Inc. v. Pic-Air, Inc.*, 790 F.2d 1098, 1105 (4th Cir.1986) (stating that "[g]ood faith ... requires that a 'legitimate commercial reason' lead a party to seek the modification"); *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 145–46 (6th Cir.1983) (stating that whether "the parties were in fact motivated to seek modification by an honest desire to compensate for commercial exigencies" is influential in determining good faith).[10] Another indicia concerns the means by which the modification was obtained. *Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d at 146. That is, one cannot benefit from a change induced by acts tantamount to economic extortion or overreaching.[11] *Id.*; 1 J.

---

9. El Paso's brief does not address whether the court inappropriately held the parties to the standard of merchants. Thus, we conclude that it has no dispute with regard to that matter.

10. Also, the commercial reason proffered must be one outside the control or cause of the party instigating modification. *T & S Brass & Bronze*

*Works, Inc. v. Pic–Air, Inc.*, 790 F.2d 1098, 1105 (4th Cir.1986).

11. An example of economic extortion arises when the market price for the good in question falls and the buyer threatens to acquire the commodity elsewhere unless the seller reduces his price. 1 J. White & R. Summers, *Uniform Commercial Code* § 1–6(b), p. 44 (4th ed.1995). Un-

White & R. Summers, *Uniform Commercial Code* § 1–6(b), pp. 43–44 (4th ed.1995). Nor may one enforce a modification when its catalyst was little more than some unfounded dispute manufactured by the party requesting modification. *Id.* at 44.

■ Finally, deception can also serve to vitiate the new agreement. Indeed, an aspect of good faith according to the legislature is simple honesty. That is why it initially defined the concept as "honesty in fact in the conduct or transaction concerned." TEX.BUS. & COM.CODE ANN. § 1.201(19). So, if trick, artifice, or misrepresentation is utilized by a party in obtaining a modification of the contract, for instance, that misconduct can later be the modification's downfall.

### B. Sufficiency of the Evidence

### 1. Standard of Review

The applicable standard of review is that found in *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264 (Tex.App.— Amarillo 1988, writ denied). That is, with regard to claims of legal insufficiency, the court examines the record only for evidence supporting the determination. All contradictory evidence is ignored. *Id.* at 276. As to claims of factual insufficiency, we are required to peruse the entire record to see if the supporting evidence is so weak or the contrary evidence so overwhelming as to make the finding clearly wrong and manifestly unjust. *Id.* Needless to the say, this does not accord us carte blanche authority to do whatever we would care to do. Quite the contrary. The standard is one of deference. We cannot simply substitute our interpretation of the evidence for that of the fact finder. Rather, the latter's factual conclusions must be accepted unless found to be

clearly wrong or manifestly unjust, given the entire record. *Id.*

### 2. Application of Standard

■ In considering the entire record, we find evidence illustrating that the gas market experienced appreciable decline several years after the 1979 Agreements were executed. And, there is no question that the drop in price was caused by factors outside the control of El Paso. Given that, one could say that El Paso had a legitimate commercial reason for endeavoring to ameliorate the situation by modifying its obligations to take-or-pay at the price and quantity set forth in the 1979 Agreements. *See Weisberg v. Handy & Harman*, 747 F.2d 416, 420 (7th Cir.1984) (stating that a "precipitous change in market price satisfies the requirement of good faith").

Yet, the record contains evidence illustrating that El Paso did more than simply approach its producers, inform them of its predicament, and attempt to negotiate a modification. Rather, in 1982, the company unilaterally reduced the amount of gas it took to less than the 80% minimum specified in the 1979 Agreements. Furthermore, it did so without disclosing its intent to Minco. It further decided, unilaterally, to eschew *voluntary* payment for the gas it did not take. That is, the 1979 Agreements contained a provision specifying the date by which El Paso had to pay for the gas it did not take. However, El Paso simply decided to ignore that provision, again without notifying its producers. Instead, the company opted to remain silent until a producer made inquiry into the situation. And, once that happened, it interposed excuses for its conduct, denied any liability, and forced them into negotiations to resolve the claim.[12]

less it can be shown that there is some recognized commercial practice in the particular trade that sanctions such a tactic, the modification could be said to have arisen through unfair means. *Id.; see Roth Steel Prod. v. Sharon Steel Corp.*, 705 F.2d 134, 145–46 (6th Cir.1983) (requiring proof that "the party's conduct is consistent with 'reasonable commercial standards of fair dealing in the trade[ ]' ").

12. A memo drafted by an El Paso employee named Bernard termed this procedure as the

denial/negotiation process. And, though the company objected to the admission of the Bernard memo describing the procedure, the objection was not incorporated into a point of error. Furthermore, other evidence admitted without objection revealed that El Paso's actions comported with the general guidelines espoused by Bernard. In effect, El Paso actually did many of the things described in the memo. Given this, it can be said that the memo was merely redundant of admissible evidence, and that its admission was, therefore, not error.

Furthermore, during the "denial/negotiation" process, the producers like Minco were effectively "boxed in," as another El Paso employee eventually admitted. Again, they had dedicated 100% of their product to El Paso. So, they could not sell it to others without El Paso's consent, and needless to say, El Paso was not consenting to such sales without first being released from potential liability for not performing. This situation was comparable to that in *Campbell Soup Co. v. Wentz*, 172 F.2d at 83. There, like here, Wentz was bound by an agreement under which his commodity was entirely dedicated to Campbell, and, like here, he too was unable to not sell it to others save with Campbell's approval. After reviewing the circumstances, the appellate court refused to enforce the unfair agreement because it was tantamount to " 'carrying a good joke too far.' " *Id.*

So, having placed Minco in a box which at least one court believed to be unfair, El Paso tendered the Amendatory Agreement to the producer. In the cover letter accompanying the agreement, the buyer represented that it was "firmly committed to solving [the problems facing it] so as to remain capable of marketing your gas." So, El Paso proposed that if Minco would agree to *retroactively* and prospectively reduce both the price to be paid for gas and quantity to be taken, then the prospects for El Paso taking gas in the future would be enhanced.[13]

As to the change in minimum take-or-pay percentage, El Paso maintained that the agreement was "soft"; that is, the provisions of the original 1979 Agreement could still be invoked to either reduce the percentage or entirely relieve the company of its duty to take-or-pay for a particular period. However, the producer's obligation to dedicate 100% of its gas to El Paso remained. So, in effect, the previously unfair contract was further enhanced in favor of El Paso. For all practical purposes, the latter found a way to escape potential liability for its prior conduct and make it easier for it to avoid, conceivably *in toto*, its future take-or-pay duties while keeping the producers obligated to dedicate all their gas to it. And, more importantly, all this was done under the pretense of enabling itself to acquire more gas from them.

But, instead of finding that El Paso was buying more, Minco encountered the opposite. Indeed, within a short time, El Paso began to forward to its producers monthly release letters. Though their format varied from time to time, their substance did not. Each informed the producer that El Paso did not intend to or could not buy gas during that month. The reasons given for avoiding its obligations were several. For instance, at times they were told that governmental regulations or the status of the market prevented it from complying. Yet, those two reasons proved less than accurate. For instance, a company representative admitted that no regulation actually prohibited it from taking gas in any particular month. This same representative also conceded that the gas could have actually been taken and paid for.

Another reason why El Paso chose not to perform was its supposed policy barring discrimination among its producers. In other words, since the total amount of gas it was required to take from all its producers exceeded its need, it chose either to forgo taking gas from any or to take a prorated fraction from all. Yet, in applying this policy against discrimination, El Paso again proved to be less than candid. For instance, in none of its monthly release letters did the company disclose to the producers that while it was not taking from them, it was actually buying gas on the spot market (at a reduced price) from *its own affiliates*. In other words, El Paso was using its anti-discrimination policy in a way to discriminate in favor of it and its own.

And, as to the assurances made in the monthly letters regarding its dedication to helping Minco and the others to "maximize [their] production and revenues," El Paso also omitted to tell them of other adverse affects they would suffer by agreeing to the temporary releases. Admittedly, the producers would gain the option to sell their prod-

13. Apparently, El Paso was not "absolutely" certain of the validity of the excuses it previously asserted. So, it made the reductions in price and quantity retroactive to assure that potential liability was avoided.

uct on the spot market (at a lesser price most likely). But, they would be extending to El Paso the option to either eliminate its take-or-pay obligation for that month or offset the amount of gas sold against its cumulative take-or-pay obligation. Moreover, El Paso admitted that the option it intended to select would be that most advantageous to it and most disadvantageous to the producer. That suggests a mode of conduct contrary to the supposed desire to maximize the production and revenues of Minco.

Finally tiring of El Paso's ongoing practice, Minco asked to end the contractual relationship. In effect, El Paso was not buying Minco's gas, and Minco could not sell it elsewhere without El Paso's approval.

When viewed as a whole, the record contains sufficient evidence from which it could reasonably be inferred that El Paso acted, with regard to each release and modification secured, like what some call a "dishonest compromiser" or extortionist. 1 J. White, R. Summers *Uniform Commercial Code* § 1–6(b) (1995). It 1) decided not to voluntarily perform its contractual obligations without informing its producers of same, 2) waited until its conduct was questioned then interjected the unwary producer into the denial/negotiation process, 3) obtained modification of its duties through the use of its power to block sales to others and by dangling hollow promises and representations in front of the producer, and 4) contrived additional reasons to avoid performing its modified duties until the producer eventually capitulated by asking to end the relationship. While this evidence may not illustrate the gross oppression implicit in unconscionability, it is some evidence of El Paso posturing its producers into granting concessions through means which were less than honest in fact.[14] And, we found no evidence of a commercial standard proven at trial which condoned the use of deceit in obtaining modifications and releases like those won here.

Of course, there is evidence indicating that El Paso believed its defenses and posturing were legally justifiable. So too is there evidence indicating that Minco may have benefitted from the modifications and releases; after all it did gain the chance to sell gas on the spot market (at a lesser price) when El Paso could have even denied it that. Yet, this contradictory evidence is not enough to overwhelm the court's finding of bad faith. Consequently, we overrule point two as it relates to Minco.

### Point of Error Three

In its third point of error, El Paso argues that the court's findings with regard to the amount of damages recoverable by Minco were legally and factually insufficient. That is, the sums awarded were based upon an average gas price which had no "competent"[15] evidentiary support, says El Paso. We disagree and overrule the point.

### A. Standard of Review

In that the standard of review concerning sufficiency points was discussed in the immediately preceding point, we simply incorporate it herein by reference. We also note, as do the parties, that one claiming damages for breach of contract must prove, with reasonable certainty, the amount of damages allegedly suffered. *Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 556 (Tex.App.—Houston [1st Dist.] 1991, no writ). Reasonable certainty, however, does not mean exactitude. As the Supreme Court recognized long ago, "[a] party who breaks his contract cannot escape liability because it is impossible to state or

14. Whether this court would have so interpreted the evidence had it been the trier of fact is irrelevant. Again, the standard of review is one of deference. Suffice it to say that the trial judge concluded that El Paso acted in bad faith, and the record contains evidence which can reasonably be construed as supporting that determination.

15. Competent evidence is that which is admissible under the rules of evidence as being able to assist the trier of fact in determining questions of fact, regardless of whether it is believable. El Paso does not argue that the evidence in question was inadmissible and, thus, incompetent; rather it posits that it was rife with flaws and therefore unworthy of credit. As to the credibility of the evidence, the reviewing court cannot substitute its conclusions for those of the fact finder. *Tseo v. Midland Am. Bank*, 893 S.W.2d 23, 26 (Tex. App.—El Paso 1994, writ denied).

prove a *perfect* measure of damages." *Southwest Battery Corp. v. Owen,* 131 Tex. 423, 115 S.W.2d 1097, 1099 (1938) (emphasis added). Quite the contrary, the claimant need only present evidence "sufficient to afford a reasonable basis for determining his loss." *Vance v. My Apartment Steak House of San Antonio, Inc.,* 677 S.W.2d 480, 484 (Tex.1984).

### B. Application of Standard

█ The parties concede that the 1979 Agreement specified the equation by which damages were to be calculated. That is, the price payable for the gas not taken was "to equal the arithmetic average of the three ... highest prices (including but not limited to escalations and adjustments for heating value and for taxes) then being paid by recognized gas pipeline companies for gas of similar quality and pressure in Hemphill County, Texas." Thus, damages were to be derived by multiplying the amount of gas not taken or paid for during the pertinent time periods by the aforementioned average. And, the average price found by the court and used in its calculation of damages was $5.789 mcf. That figure was derived by adding $5.658, $5.027, and $6.683 (the three highest prices found by the court) together and then dividing the sum by three.

The three prices used by the trial court to calculate the average price were just three of many testified to at trial. One expert of Minco discovered "several dozen gas prices" which could have fit the requisite criteria. Among them were the mcf prices of $8.86, $6.99, $6.86, $6.70, $6.62, $6.58, $5.89, $5.65, $5.03, $4.98, and $3.86. Others were interspersed between those amounts. And, while they were initially obtained from an information service, effort was made to verify them. Yet, doing so proved difficult given the number of years which had passed since the Amendatory Agreement was executed and the general reluctance of pipeline companies "to give [the information] up."

Nevertheless, some prices were independently verified by Minco's expert, and only they were used by him to secure the arithmetic average spoke of in the 1979 Agreement. Those prices included $6.683, $5.658, $5.258, $5.027, $5.03, and $4.728. According to the expert, each took into consideration adjustments and escalations for heating value (BTUs) and taxes, as provided in that agreement.

In comparing the court's finding regarding the highest prices paid with the testimony of Minco's expert, we conclude that the former is legally supportable. Simply put, the figures adopted by the court were three of the six testified to by the expert. Thus, there is some evidence to support them. We also conclude that the finding was factually sufficient, given this testimony. Admittedly, El Paso attempted to discredit it by depicting possible flaws in the witness' calculations and by proffering testimony suggesting that the prices may not have involved actual sales. Yet, this did not render the testimony incompetent, just subject to question. And, in that situation, it became the trial court's right and duty to assign it the weight it thought appropriate.

Moreover, we cannot forget that all Minco had to do was prove its damages with reasonable certainty; that standard does not mandate unquestionability. The evidence adduced by Minco may have been less than unquestionable, but, it nevertheless met the standard of reasonable certainty. In sum, neither the contradictions appearing in it nor the other evidence of record contradicting it was enough to overwhelm the court's findings that $5.789 was the average of the three highest prices as required by the 1979 Agreement.

### Conclusion

Accordingly, we reverse that part of the judgment which awards Doornbos damages and attorney's fees against El Paso and render judgment declaring that Doornbos take nothing against El Paso.[16] In all other respects, however, the judgment is affirmed.

16. We note that our decision relieves us from having to address Doornbos' cross-point. Since we have held that he failed to set aside the February 1991 agreements by which it released El Paso from liability, it matters not whether the life of the 1979 Agreement was extended to April 1991. And, the latter topic is the subject of Doornbos' cross-point.

## ON MOTION FOR REHEARING

Charles F. Doornbos, individually and as trustee of the Charles F. Doornbos Revocable Trust, (Doornbos) moved for rehearing. Though a number of objections were made with regard to our opinion, only one needs addressing. It pertains to whether El Paso Natural Gas Company (El Paso) preserved argument *vis-a-vis* the defense of release. Specifically, Doornbos alleged that because El Paso failed to request findings of fact and conclusions of law regarding its claim that the February 1991 Termination Letter signed by the two parties constituted a release or waiver of all claims, it waived its opportunity to contend on appeal that the document effectuated a release or waiver. So too did he allege that the court is without power to find the document was a release. We agree.

■■ A party asserting an affirmative defense (like release or waiver) in a trial before the court must request findings in support thereof in order to avoid waiver. *Augusta Dev. Co. v. Fish Oil Well Serv. Co.,* 761 S.W.2d 538, 542 (Tex.App.--Corpus Christi 1988, no writ); *First Coppell Bank v. Smith,* 742 S.W.2d 454, 464-65 (Tex.App.--Dallas 1987, no writ); *Pinnacle Homes, Inc. v. R.C.L. Offshore Eng. Co.,* 640 S.W.2d 629, 630 (Tex.App.--Houston [14th Dist.] 1982, writ ref'd n.r.e.). Furthermore, if the findings issued by the court do not encompass any element of the defense asserted, then the failure to request additional findings relevant thereto effects a waiver. *Id.*

■ Here, Doornbos signed numerous documents over the life of the original 1979 take-or-pay contract which could be considered releases. Generally, they fell into three categories. The first encompassed the Amendatory Agreement, the second, the Monthly Releases, and the third, the February Termination Letter. In its findings of fact issued on October 23, 1995, and relating to unconscionability, the trial court held that the documents in the first and second categories were releases. Yet, it expressly refused

to rule upon whether the Termination Letter was one.[1] We conclude that this satisfied El Paso's obligation to request a finding on the matter. Simply put, when a court states in its findings that it will not determine whether a document is a release, it is an exercise in futility to require the party arguing it is a release to again ask the court to hold it a release. The topic had been presented to the court, and the court clearly commented upon it in its findings. So, this was not a situation wherein no element of the defense went mentioned in the findings. However, this does not end the matter.

■■ Because the Termination Letter was not found to be a release below, it became El Paso's burden to prove on appeal that the document was a release, as a matter of law. *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 690 (Tex. 1989) (to attack the adverse finding to an issue upon which it had the burden of proof, appellant had to assert that it had established justification or excuse as a matter of law). But, the question was never assigned a point of error. Nor was the topic expressly addressed anywhere in its brief. Rather, El Paso merely argued that the court's findings regarding unconscionability, bad faith, and damages were insupportable. Nowhere in the brief did El Paso contend that the court erred in refusing to hold the February Termination Letter a release, nor that it had proved, as a matter of law, that the letter was a release. More importantly, we cannot raise points of error *sua sponte.* As the Texas Supreme Court recently reiterated, our task is to consider only those issues presented by the parties.[2] *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex. 1993). Thus, in holding that the Termination Letter was a release in our original opinion, we wrongly raised and resolved the factual question of whether the document was a release. So too did we make an original fact finding on the matter despite our inability to find facts, *Rodriguez v. Ortegon,* 616 S.W.2d 946, 950 (Tex.Civ.App.--Corpus Christi 1981, no writ), and El Paso's failure to seek review

---

1. Therein, it stated that "[t]he Court makes no ruling as to whether such language [in the Termination Letter] is sufficient to operate as a release of past take-or-pay damages."

2. Of course, we are always free to raise jurisdictional questions on our own.

of the issue. That was a mistake which now necessitates correction. We do so by recognizing that nowhere was the Termination Letter held to be a release and that El Paso failed to challenge the court's refusal to so hold it. Finally, in recognizing our mistake, we must also reconsider portions of El Paso's three points of error.

### Point One—Unconscionability

█ In previously addressing point one, we held that the Termination Letter was not unconscionable and that the trial court abused its discretion when it found otherwise. We also concluded that the Termination Letter constituted a release. Given the latter conclusion, we thought it unnecessary to determine whether the trial court's decision to hold the Amendatory Agreement and Monthly Releases unconscionable constituted an abuse of discretion. Now, that dispute must be resolved.

As to the Amendatory Agreement, the trial court did find it unconscionable given the presence of procedural and substantive abuse. The procedural abuse consisted of three purportedly misleading statements uttered by El Paso. The first involved the representation that the take-or-pay contract would be "more market responsive" with the modifications, the second, that the Amendatory Agreement "was an 'opportunity'" for Doornbos, and the third, that El Paso "was not obligated to take-or-pay for 80% of the aggregate maximum delivery capacity of seller's wells." The substantive abuse consisted of the absence of sufficient economic benefit flowing to Doornbos in return for signing the agreement. Yet, the trial court said nothing about the relative bargaining strength of the parties at the time the items were signed. Nor did it discuss the relative business acumen, knowledge, education, or financial ability of the parties or the presence or absence of viable business alternatives. To the extent that all these crucial indicia went unaddressed, the court did not permissibly exercise it discretion.

Moreover, we found nothing contradicting the evidence that Doornbos was anything other than a highly educated, financially successful individual experienced in the business of oil and gas. His acumen went so far as to cause him to surround himself with corporate officers cognizant in the law and oil and gas trade. Additionally, these individuals were accessible to him for legal advice when needed, according to the record. On the other hand, we find no evidence indicating that anyone objected to signing the Amendatory Agreement or attempted to renegotiate its terms before signing it. In sum, the record established that Doornbos merely signed the document when presented by El Paso. This too illustrates a basis for holding the trial court's decision insupportable once the totality of the circumstances are perused.

As to the numerous Monthly Releases, they were also deemed unconscionable due to the presence of procedural and substantive abuse. According to the court, the former was exemplified by several misrepresentations relating to El Paso's ability to take gas and its supposed desire to maximize the producer's revenues. Furthermore, the substantive abuse consisted of an absence of a *quid pro quo*; that is, the Releases were too "one-sided" in favor of El Paso. Yet, as with the Amendatory Agreements, nothing was said about the parties' relative bargaining power nor about Doornbos' education, experience, business acumen, and financial strength. Nor was anything said about the existence of viable alternatives. And, upon considering the evidence on those matters we again see that Doornbos was an astutely successful businessman experienced in the matter of oil and gas. So too do we see evidence that neither he nor anyone else associated with him questioned El Paso's conduct prior to signing approximately 80 Releases. *See Resources Inv. Corp. v. Enron Corp.*, 669 F.Supp. 1038, 1042 (D.Colo. 1987) (holding that multiple releases contained in 32 contracts signed over an 18 year period would indicate a lack of unconscionability). Indeed, one of the principals testified that he routinely signed the Monthly Releases because he thought Doornbos had a policy favoring the release of take-or-pay claims, not because he was duped by El Paso.

Finally, nothing of record indicates that simply refusing to execute the Monthly Releases, or the Amendatory Agreement for

that matter, was an unrealistic option. Had the wells encompassed by the agreements been the only ones Doornbos had (which they were not) or had they been the only source of income (which they were not) then standing firm against, and suing, El Paso may not have been viable. But, the record does not support such a conclusion.

So, like the finding pertaining to the Amendatory Agreement, that regarding the Monthly Releases also constituted abused discretion. The trial court did not consider indicia highly relevant to the issue. Thus, we conclude as a matter of law that the indicia relied upon by the trial court were alone not enough to demonstrate unconscionability.

### Point Two—Good Faith/Bad Faith

■ Under point two, El Paso questioned the court's decision to 1) impose upon El Paso a duty to act in good faith *vis-a-vis* obtaining modification of the Amendatory Agreement and Monthly Releases and 2) find that the duty was breached. We previously failed to address that matter as it related to Doornbos because we incorrectly assumed that the February Termination Letter constituted a release. But, as illustrated above, that assumption was wrong. Therefore, we now consider it.

The applicable law and standard of review was sufficiently developed in our original opinion and need not be reiterated. Suffice it to say that the Texas Business and Commerce Code section 1.203 imposed upon El Paso the duty to act in good faith *vis-a-vis* the modification and performance of the original 1979 take-or-pay contract, the Amendatory Agreements, and the Monthly Releases. We further conclude that the trial court's findings that El Paso breached the duty enjoyed factually sufficient evidentiary support. The evidence supporting our determination is the very same which supported the court's findings *vis-a-vis* Minco Oil & Gas Company (Minco), since the record illustrates that El

Paso treated both producers similarly. Again, rather than reiterate the evidence, we simply refer the parties to our analysis under point two to the original opinion.

Consequently, we now overrule, *in toto*, El Paso's point of error two.[3] The trial court did not err in refusing to enforce the Amendatory Agreement and Monthly Releases since they were the product of bad faith. Sufficient evidence existed to support the findings and insulate them against attack as factually sufficent, despite the evidence to the contrary.

### Point Three—Damages

■ Since we have determined that the trial court did not err in holding that the Amendatory Agreements and Monthly Releases were the product of bad faith, it is now incumbent upon us to address El Paso's third point of error as it related to the award given Doornbos. As explained in our original opinion, El Paso argued that the sums awarded to both Doornbos and Minco "were based upon an average gas price which had no 'competent' evidentiary support." As also previously explained by us when addressing the damages awarded to Minco, we concluded that the record did contain the requisite supporting evidence. Rather than reiterate it, we again refer the parties to our original opinion and its analysis of that evidence. So to do we hold that the damages given Doornbos for El Paso's breach of contract enjoyed legally and factually sufficient support.

Accordingly, we modify our judgment and opinion issued herein on December 10, 1997, affirm the trial court's judgment, and deny Doornbos' motion for rehearing except to the extent he argued that we improperly determined that the Termination Letter constituted a release.

**3.** We note that the theories of unconscionability and good faith/bad faith, as found in the Texas Business and Commerce Code sections 1.203 and 2.302, are distinct. The focus of the former apparently lies on both parties while that of the latter lies upon the party accused of bad faith. Moreover, it may be that the existence of bad faith may be weighed in determining whether someone acted unconscionably, but it alone does not establish unconscionability. Again, the latter involves the consideration of a plethora of factors, not merely bad faith. So, while it may be that the evidence does not support a finding of unconscionability, that does not *ipso facto* warrant the conclusion that El Paso acted in good faith.